05-4327-cv
Burgess v. Astrue

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2007

(Argued: April 23, 2008               Decided: August 8, 2008)

Docket No. 05-4327-cv

_____

DOLEEN BURGESS,

Plaintiff-Appellant,

- v. -

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant-Appellee.

_____

Before: JACOBS, Chief Judge, KEARSE and KATZMANN, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York, Nina Gershon, Judge, upholding the denial of disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq.

Vacated and remanded.

ROBERT FARLEY and JEAN TROAST, law students appearing pursuant to Interim Local Rule 46(e), Seton Hall University School of Law, Center for Social Justice, Newark, New Jersey (Jon Romberg, Supervising Attorney, on the brief), for Plaintiff-Appellant.

JOHN M. KELLY, Special Assistant United States Attorney, Brooklyn, New York (Benton J. Campbell, United States Attorney for the Eastern District of New York, Varuni

Nelson, Kathleen A. Mahoney, Assistant United States Attorneys, Brooklyn, New York, on the brief), for Defendant-Appellee.

KEARSE, Circuit Judge:

Plaintiff Doleen Burgess appeals from a judgment of the United States District Court for the Eastern District of New York, Nina Gershon, Judge, dismissing her complaint seeking disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. The district court granted the motion of defendant Commissioner of Social Security ("Commissioner") for judgment on the pleadings, finding that there was substantial evidence to support the Commissioner's denial of benefits on the ground that Burgess was not disabled within the meaning of the Act because she retained the residual functional capacity to perform the requirements of her past relevant work. On appeal, Burgess contends that the Administrative Law Judge ("ALJ") who reviewed her claim, and whose decision became that of the Commissioner, erred by failing to (a) give controlling weight to the opinion of her treating physician, (b) explain the reasons for giving that opinion minimal weight, and (c) fully and adequately develop the record. For the reasons that follow, we vacate the judgment of the district court and remand to the Commissioner for further proceedings.

I. BACKGROUND

The event leading to Burgess's claim for disability insurance benefits is not in dispute. On October 7, 1997, Burgess, then 32 years of age, was employed by a photography laboratory to perform accounting work. While at work, she fell over a box in a storage room, hitting her knees and elbows on the concrete floor. She was treated at a hospital emergency room; three days later she began treatment by Dr. Milton M. Smith, a specialist in the field of orthopedics; and she began physical therapy. Burgess returned to work at the photography laboratory some two weeks after the accident. She continued to work until February 1998, when she stopped because of the pain caused by injuries from the accident. In April 1999 Burgess applied to the Social Security Administration ("SSA") for disability insurance benefits under the Act, stating that she was unable to work because of pain in her leg and back.

Under the Act, "disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "The impairment must be of 'such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Shaw v. Chater, 221 F.3d 126, 131-32 (2d Cir. 2000) ("Shaw") (quoting 42 U.S.C. § 423(d)(2)(A)).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine

whether the claimant's condition meets the Act's definition of disability. See 20 C.F.R. § 404.1520. Essentially,

> "if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do."

Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) ("Green-Younger") (quoting Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002)) (bracketed phrase in Green-Younger).

Burgess's application was denied initially and on reconsideration. She then requested and received a hearing before an ALJ.

A.   The Evidence Before the ALJ

At the hearing before the ALJ, held in May 2002, Burgess described her accident and testified that she and her three daughters had moved to live with her mother following the accident. Burgess testified that she did not do any household chores such as cleaning, cooking, and shopping, and that her mother and daughters performed those tasks. Aside from visiting her doctors, attending hearings on her claim for worker's compensation, and occasionally having her mother take her for a walk to the street corner, Burgess spent her days propped up in bed.

Burgess testified that her daily work as an accountant at the photography laboratory had involved two-to-three hours sitting at her desk and five-to-six hours standing and walking. As to her

prior jobs, Burgess had worked for the photo laboratory as a receptionist; for other employers, she had worked as a cashier, a caretaker for children at a day care center, a cook and helper at a senior citizen home, and a salesperson in a department store. Her job as a salesperson had required her to be on her feet for virtually the entire workday. Burgess testified that she had not worked since February 1998 because she constantly had pain radiating down to her legs and feet--although some days were better than others. She testified she could not walk continuously for more than two blocks, stand continuously for more than 25 minutes, or sit for more than 15-20 minutes, without pain. Her pain was treated with Tylenol and Motrin.

As discussed below, the medical evidence in the record before the ALJ included reports and findings by

- Dr. Smith, the orthopedic surgeon who was Burgess's primary treating physician starting three days after her accident and continuing through the time of the hearing before the ALJ, and who performed arthroscopic surgery on Burgess's left knee in May 1998;

- Dr. Choong Kim, who treated Burgess at least once a month for more than a year after the accident and prescribed physical therapy;

- Dr. Franklin Turetz, who performed an MRI on Burgess's knee in March 1998;

- Dr. Javier Beltran, who performed an MRI on Burgess's back in January 1999;

- Dr. Mario Mancheno, who examined Burgess once in June 1999; and

- Dr. Robert Zaretsky, who examined Burgess a dozen times for the Workers' Compensation Board.

The record before the ALJ also included the testimony given by Dr. Smith in Burgess's case before the Workers'

Compensation Board (or "Board") in May 2000.  And Dr. Ernest Abeles, an orthopedic surgeon who had not examined Burgess, testified before the ALJ as an expert.

### 1.  The Evidence from Dr. Smith and the MRIs

Burgess, on her initial visit to Dr. Smith three days after her accident, complained of swelling and buckling of her left knee, which upon examination revealed "diffuse swelling and tenderness" and a limited range of motion.  (Report of Dr. Milton Smith dated October 10, 1997.)  X-rays on Burgess's knees were negative, and Dr. Smith diagnosed "[i]nternal derangement of the left knee."  (Id.)  At that time, Dr. Smith noted that Burgess had started a course of physical therapy, and he opined that she could work in a sedentary position.  In December 1997, Burgess complained of left knee pain and "continued back pain."  (Report of Dr. Milton Smith dated December 12, 1997.)  She had limited ranges of motion in her back and knee, was then working in a sedentary position, and was receiving physical therapy.  (See id.)  Dr. Smith's reports for January and February 1998 stated that Burgess continued to report pain and buckling in her left knee, and on March 17, 1998, an MRI was taken of that knee.

That MRI showed that there was a "SMALL AMOUNT OF FLUID IN KNEE JOINT WITH GREATER AMOUNT OF FLUID IN LATERAL ASPECT OF SUPRAPATELLAR RECESS.  SUGGEST POSSIBLE TRUNCATION, NOTCH ASPECT OF POSTERIOR HORN OF MEDIAL MENISCUS."  (Report of Dr. Franklin Turetz dated March 19, 1998.)  Dr. Smith examined Burgess on March 20 and reported that she continued to have pain in her left knee.  His

report noted that the MRI showed evidence of a torn medial meniscus and that the Workers' Compensation Board had authorized arthroscopic surgery.

Dr. Smith performed the arthroscopic surgery on Burgess's left knee in May 1998. His operative report stated that no tear of the meniscus was found, but that there was hypotrophic synovium throughout the knee. At the Workers' Compensation Board hearing (two years later) Dr. Smith explained that hypotrophic synovium was an inflammatory process that was not reparable through surgery and that Burgess likely would eventually need knee replacement. (Workers' Compensation Board Hearing Transcript May 8, 2000 ("WCB Tr."), at 17.) He stated that although the arthroscopy showed no large tears, "the meniscus was fragmented" and that "a lot of small pieces . . . had to be irrigated out." (Id. at 16.)

On May 29, 1998, some three weeks after the knee surgery, Dr. Smith's examination report stated that Burgess still had pain in her knee and in her lower back, but with improving range of motion. In June, Dr. Smith reported that Burgess was experiencing less pain in her knee, and had an improved, albeit still limited, range of motion; he opined that she could perform sedentary work. In July, he reported that Burgess had continued pain in the knee, with an improved but still limited range of motion. From August through December 1998, Dr. Smith's monthly reports on his examinations of Burgess stated that she continued to have pain in her left knee, as well as pain in her neck and back, all with limited ranges of motion.

On January 8, 1999, an MRI was performed on Burgess's

back.  The report on that MRI stated, <u>inter alia</u>, as follows:

> Evaluation of the far sagittal images through the neural foramen reveal <u>encroachment of the left neural foramen of L2-3 by what appears to be disc material</u>, producing stenosis in the anterior/posterior direction.

(Report of Dr. Javier Beltran ("MRI Report") dated January 8, 1999, at 1 (emphasis added).)  Dr. Smith examined Burgess on January 20, 1999, and his report noted that the MRI on Burgess's spine revealed a protruding disc at the L2-3 level.  (His testimony elaborating on this at the Board hearing is discussed below.)  Her treatment regimen continued to consist of over-the-counter pain relievers, warm soaks, and active range of motion; Dr. Smith noted that the Workers' Compensation Board had discontinued authorization for Burgess's physical therapy and he requested its reinstatement.

From March 1999 through October 1999, Dr. Smith's reports of his monthly examinations of Burgess stated that she continued to have pain in her back and one or both of her knees, and limited ranges of motion.  Dr. Smith's view of Burgess's capabilities in August 1999, according to the boxes he checked on a physical-capacities-evaluation form, was that Burgess could sit, stand, or walk for no more than three hours out of an eight-hour workday, and that she could not lift or carry more than five pounds.

Dr. Smith's report in December 2000 stated that Burgess continued to have pain in her leg, neck, and back, with limited ranges of motion.  It stated that Burgess "is not able to return to work.  She has a total degree of disability."  (Report of Dr. Milton Smith "To Whom it May Concern" dated December 7, 2000.)  Dr. Smith's reports in 2001, following examinations of Burgess virtually every

month, similarly described Burgess as continuing to experience pain in, _inter alia_, her neck, back, and left knee.  In late 2001 the reports indicate that Dr. Smith diagnosed Burgess with, _inter alia_, in addition to the continued derangement of her left knee, a cervical sprain and lumbosacral radiculopathy.

In his testimony before the Workers' Compensation Board in May 2000, Dr. Smith stated that his initial diagnosis of Burgess's injuries was internal derangement of the left knee, which was caused by the accident.  At that point, Burgess had a "marked disability" and could work only in a sedentary position.  (WCB Tr. 4.)  Dr. Smith explained that he amended his initial findings to add findings of neck and back injuries because they resulted from Burgess's initial injury, and that the fact that he did not mention them in his initial report did not mean that Burgess had not experienced pain in those areas.

Dr. Smith testified that Burgess "had an MRI of the lumbar spine dated 1/8/99 which showed presence with protrusion of the dis[c] at the L2-3 level which was protruding into the neural foramen," which "mean[t] that she has a nerve root that [wa]s being pushed upon by the dis[c], which [wa]s very painful."  (_Id_. at 5.)  He testified that his "clinical findings on examination [were] consistent with the MRI."  (_Id_.)  Questioned further, Dr. Smith testified the MRI Report's revelation that there was "protrusion into the neural foramen" at "L2-3"

> mean[t] that the dis[c] has changed its normal shape and part of that dis[c] is now pushing out into the foramen, which is the hole through which the nerve root exits the spine.  In so doing, it's encroaching on the space that is normally there in the nerve root.  So every time the patient moves a certain way

it drags that nerve root across the dis[c] material and is very painful.

(WCB Tr. 8-9 (emphases added).) Dr. Smith testified that although the MRI Report did not say directly that Burgess's disc was impinging on the nerve root, it so stated

indirectly. Evaluation of the far sagittal images. That means the images over the site through the neural foramen reveal encroachment, which means, take up the space of the left neural foramen of L2-3 by what appears to be dis[c] material producing stenosis in the anterior, posterior direction. Stenosis is a narrowing and, thereby, pinches in the neural foramen. If there is stenosis, by definition, the nerve root is being severed.

. . . .

. . . Normally the nerve root passes from the spinal cord out through this hole and goes to the lower extremities. If you have any object in that hole, whether it is arthritis or a tumor or dis[c] material, as in this case, it's taking up part of the space that is normally filled by the nerve. There is usually a little space within that hole around the nerve. The reason for this space is that as the person moves and bends that nerve is pulled tight around the edge of that hole. If you put a foreign object in this, in this case dis[c] material, there is no room for the nerve root to move. In certain positions, each time the person moves their body it creates superficial pain. . . . What happens is that the nerve root normally passes through a small space. There is normally excess space so the body could move. If you occupy that space with something else, you are effectively pinching that nerve each time the person moves.

(Id. at 9-11 (emphases added).) Thus, although "[t]he MRI d[id] not specifically say that the nerve root is impinged," it "us[ed] other words that mean the exact same thing." (Id. at 11-12.)

Dr. Smith's April 18, 2002 report "To Whom it May Concern" described Burgess's condition as of that date and gave an overview of her condition for the 4½-year period in which he had treated her. As of April 2002, Burgess still complained of pain in her neck,

back, and left knee, and had limited ranges of motion in those areas. Her course of treatment included the pain reliever Motrin and an active range of motion, with a follow-up visit scheduled for four weeks later. Dr. Smith concluded that Burgess "has been totally disabled throughout the course of my treatment of her and remains severely restricted in her ability to function in a normal routine."

In May 2002, Dr. Smith filled out a physical-capacities-evaluation form and checked boxes opining that Burgess could sit for a total of no more than one-to-two hours out of an eight-hour workday. In addition, he opined that she could stand and walk for a total of one hour out of an eight-hour workday, but could do each only for fifteen minutes at a time.

2. Other Evidence Before the ALJ

In addition to being treated by Dr. Smith, Burgess was treated by Dr. Kim for more than a year, beginning just over a week after the accident. His initial diagnosis was that Burgess suffered traumatic internal derangement of the cervical and lumbosacral spines with sprain and strain of ligaments and muscles, traumatic lumbar radiculitis with radicular pain into the left lower extremity, traumatic myofascial pain dysfunction syndrome, and fracture of the left patella. He stated that Burgess was "disabled at present with serious and substantial functional impairment associated with symptoms subject to recurrence and acute exacerbations," and that "[t]he prognosis for recovery following such trauma and injuries [wa]s guarded because of the possibility of

- 11 -

long term or lifelong symptomatology." (Report of Dr. Choong Kim dated October 16, 1997.) Subsequent diagnoses stated that Burgess had, inter alia, traumatic cervical and lumbosacral derangements. Dr. Kim prescribed physical therapy.

Dr. Zaretsky examined Burgess for the Workers' Compensation Board a dozen times from April 23, 1998 through January 17, 2001. In several of his reports, Dr. Zaretsky described certain pain complaints by Burgess that he opined were not physiologically credible. (See Reports of Dr. Robert Zaretsky dated October 1 and November 19, 1998, October 21, 1999, and November 1, 2000.) In November 1998, Dr. Zaretsky stated that he "d[id] not find any evidence of disability flowing from [Burgess's] back, neck, ankle or foot" (Report of Dr. Robert Zaretsky dated November 19, 1998), but thereafter he learned of the January 1999 MRI on Burgess's back and he requested and received the MRI Report. His report in May 1999 stated that "at this time a mild partial disability is noted rel[e]vant to findings of the lumbar MRI." (Report of Dr. Robert Zaretsky dated May 20, 1999.) In a January 2000 report, Dr. Zaretsky again noted "a mild partial disability . . . relevant to findings in the lumbar MRI," but stated his opinion that Burgess was "capable of gainful employment." (Report of Dr. Robert Zaretsky dated January 12, 2000.) None of his subsequent reports repeated that opinion, however, and all of them noted a continued "mild" "partial" "disability," usually citing the "MRI findings" concerning Burgess's lower back. (Reports of Dr. Robert Zaretsky dated May 3, August 30, and November 1, 2000, and January 17, 2001.) The November 2000 and January 2001 reports stated that that disability

could be considered permanent.

Dr. Mancheno, who examined Burgess once in June 1999, diagnosed her as having, inter alia, a discogenic disorder of the lumbosacral spine. His report stated that Burgess said that she did her own shopping, cooking, and cleaning. Dr. Mancheno opined that Burgess had a mild impairment of her ability to sit, stand, walk, lift, carry, push, and pull. In the section of his report recounting Burgess's history, Dr. Mancheno noted that Burgess reported that she "did have MRI with abnormalities reported"; however, in the "Laboratories" section of the report he listed only X-rays of the knee and spine, with no mention of an MRI. (Report of Dr. Mario Mancheno dated June 3, 1999.)

The record before the ALJ also included a report form filled out by a state agency medical consultant on July 6, 1999, and endorsed by another such consultant on October 1, 1999, both of whom had reviewed the record to provide a residual-functional-capacity opinion to the Commissioner, but neither of whom had examined Burgess. The boxes checked indicated that Burgess could frequently lift 25 pounds and occasionally lift 50; that she could sit for about six hours out of an eight-hour workday; and that she could stand or walk for about six hours out of an eight-hour workday. In the section of the form that asked for an explanation of how and why the evidence supported the consultants' conclusions, the response was that the X-rays of Burgess's spine and knee were normal. The consultants did not mention, inter alia, the MRI on Burgess's spine.

The only witness other than Burgess to testify at the hearing before the ALJ was Dr. Abeles, an orthopedic surgeon who had

reviewed the medical evidence in the record and observed Burgess's testimony at the hearing, but had not examined her. (The Commissioner notes in his brief on appeal at 22 n.4 that since the time of the hearing in this case, Dr. Abeles has entered into a Consent Decree that limits his practice of medicine in New York State to conducting consultative examinations for the SSA and insurance carriers.) Dr. Abeles, when asked by the ALJ "what the [medical] record reveals about this young woman" (Hearing Transcript, May 9, 2002 ("ALJ Tr."), at 36), stated that the record showed that Burgess had suffered contusions of both knees, but that the X-rays were normal; and that she had had arthroscopic surgery on her knee, but that the only abnormal finding from that procedure was that certain tissue was less prominent than normal.

When the ALJ asked "what other objective evidence we have other than the fact that we have a negative x-ray[], contusion in both knees," and "[a]n arthroscopy which revealed nothing," Dr. Abeles responded

> Yeah. I see nothing else that's available to me that's on the record. The x-rays of the back are also within normal limits. There is some mention of an MRI, but there is no report of an MRI of the lumbar spine.

> Q. [ALJ]: Of the lumbar spine--

> A. Lumbar spine. There's no report of it.

> Q. X-rays of the back were normal and no report of the lumbosacral?

> A. There apparently was one done, because there's a letter here of '99 which shows a protruding disc at the L2/3 level on an MRI in a letter of Dr. Smith, but there is no report incorporated in the records.

> Q. I see. And any other findings in a chart

- 14 -

at all in this proceeding?

A. Just that there are continued complaints of pain of the neck, back, and left knee, but no examination finding other than that.

(ALJ Tr. 38 (emphases added).)

When the ALJ asked about Dr. Smith's conclusion that Burgess was totally disabled, Dr. Abeles stated, "I don't think there is any objective reason why she couldn't" sit, stand, and walk "six hours out of an eight-hour workday." (Id. at 40.) He stated that, Burgess having "had extensive physical therapy[, s]he should at this point be able to do these things. There is no objective reason why she can't." (Id.) Dr. Abeles attributed Burgess's weakness to atrophy of her muscles from "lying in bed not doing anything," opining that "[t]here is no other reason for any of this." (Id. (emphasis added).)

In response to questions from counsel for Burgess, Dr. Abeles testified he believed that Burgess "feels the[] things" reflected in her subjective complaints and that "subjectively she has [a] disability" (ALJ Tr. 41). But as to Dr. Smith's conclusions, Dr. Abeles testified that he did not think Burgess was disabled "objectively," and that although he "th[ought] that in good faith [Dr. Smith] can write that, . . . he's been seeing this patient month [in] and month out. And he is being influenced by seeing her . . . ." (Id.)

B. The ALJ's Decision

The ALJ denied Burgess's claim for disability insurance benefits, finding that Burgess "is not disabled within the meaning

- 15 -

of the Social Security Act." ALJ Decision Denying Benefits dated October 29, 2002 ("ALJ Decision"), at 1. Evaluating the evidence within the framework of the five-step evaluation called for in the SSA regulations, and referring to some of the reports of Drs. Kim and Smith and to the report of Dr. Mancheno, the ALJ found that Burgess met the first two steps, i.e., that she was not working and had a severe impairment. However, relying on Dr. Abeles's hearing testimony, the ALJ found that Burgess did not meet steps three and four, i.e., he found that her impairment was not one that, under the regulations, conclusively requires a determination of disability, and that she had not proven that she was not capable of resuming her prior type of work. The ALJ stated:

> Dr. Abeles testified that the claimant sustained a contusion as a result of her fall, but there was there [sic] no evidence of any fractures and the claimant's xrays were normal. Moreover, he testified the claimant's radiological findings in May 1998 revealed nothing abnormal, leg flexion was 5/5 at a follow-up examination, and xrays of the back were normal. <u>He testified the claimant's treating physician mentioned a lumbar MRI, however, there was no report of findings</u>. Dr. Abeles testified the progress notes from Dr. Smith shows continued complaint of pain, however, there were no clinical findings upon examination, outside of intermittent knee swelling. <u>Moreover, he testified there is no objective reason</u> why the claimant should have any vocational limitations, and he opined that the claimant should be able to work, given her extensive physical therapy treatment.

ALJ Decision at 3 (emphases added). The ALJ found that Burgess's

> allegations of total inability to work due to back pain cannot be credited. First, <u>the objective findings of record do not show an impairment which can be reasonably expected to produce the pain alleged</u>. The medical documentation failed to present evidence of back surgery, a back brace, or stronger pain medication, criteria that is [sic] usually found when severe back pain is present.

ALJ Decision at 4 (emphasis added); see also id. ("the complaints suggest a greater severity of impairment than can be shown by the objective medical evidence alone" (emphasis added)).

The ALJ noted that although he was required to "consider medical source opinion concerning such issues as residual functional capacity," and he had considered Dr. Smith's opinion that Burgess was completely disabled, he rejected that opinion in light of the testimony of

> Dr. Abeles . . . that there is no objective reason why the claimant's sitting, standing, or walking would be limited. In fact, he testified the claimant's complaint of pain is subjective. The undersigned is not bound to accept a treating physician's conclusion as to disability, particularly when it is not supported by detailed, clinical, and diagnostic evidence.

ALJ Decision at 5 (emphases added).

The ALJ also noted that the state agency medical consultants had reviewed Burgess's medical records and had indicated that Burgess was "capable of medium work activity at the time of the[] assessment." Id. The ALJ concluded that based on all of the evidence submitted, Burgess "retains the residual functional capacity to perform light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds (20 C.F.R. § 404.1567)." Id. Although the ALJ did not expressly refer to other aspects of "light work," that category has been interpreted to include work that "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." See Social Security Ruling 83-10. The ALJ concluded that Burgess had the residual functional capacity to perform her past work "as a salesperson," ALJ Decision at 6, and that she was not disabled

- 17 -

within the meaning of the Act.

The SSA Appeals Council denied Burgess's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner.

C. The Decision of the District Court

Burgess promptly commenced the present action seeking judicial review of the ALJ's decision. Both Burgess and the Commissioner moved for judgment on the pleadings. At the hearing on the motions, Burgess's attorney pointed out that the ALJ (and Dr. Abeles) had erred in believing that the MRI on Burgess's back was not in the record. The district court agreed that the ALJ's belief was clearly error, but it rejected the contention that the MRI provided objective evidence to support Dr. Smith's evaluation that the bulging disc shown in the MRI would cause Burgess pain whenever she moved.

At the close of the hearing, the court denied Burgess's motion and granted that of the Commissioner, finding that the ALJ's decision was supported by substantial evidence and was free from legal error. The court stated that

> [w]hat's critical here is that there was <u>no laboratory or clinical evidence of nerve impingement</u> so that while <u>there is objective evidence as [Burgess's attorney] has argued</u>, the ALJ properly found that the plaintiff had a severe impairment of lumbar dis[c] disease but that doesn't in and of itself mean she is disabled . . . .
>
> . . . .
>
> . . . <u>[T]he MRI report itself does not say anywhere that there is nerve impairment or impingement</u> and the only fair reading I think of Dr. Smith's testimony with respect to the MRI is that

- 18 -

the narrowing seen on the MRI <u>could</u> lead to nerve impairment or impingement which <u>could</u> cause pain although one would have to ask why was she in pain all the time since he says it could cause pain when she moves.

> <u>There are no actual positive nerve findings which are the critical thing here when we are dealing with pain by Dr. Smith.</u>

(District Court Hearing Transcript, June 25, 2005 ("D.Ct. Tr."), at 14-15 (emphases added).) Judgment was entered in favor of the Commissioner, and this appeal followed.

## II. DISCUSSION

On appeal, Burgess contends that the ALJ erred by failing to (a) give Dr. Smith's opinion controlling weight under the "treating physician rule," (b) explain his reasons for giving Dr. Smith's opinion minimal weight, and (c) fully and adequately develop the record. While it is not clear that the record required the ALJ to give Dr. Smith's opinion controlling weight, we conclude that further proceedings are required because, given the record as it had in fact been developed, the ALJ did not provide an adequate explanation for his rejection of that opinion, 20 C.F.R. § 404.1527(d)(2).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." <u>Shaw</u>, 221 F.3d at 131 (quoting 42 U.S.C. § 405(g)). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) ("Halloran") (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "On appeal, we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Shaw, 221 F.3d at 131. We may not properly "affirm an administrative action on grounds different from those considered by the agency." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) ("Melville").

The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, see, e.g., Draegert v. Barnhart, 311 F.3d at 472, and "bears the burden of proving his or her case at steps one through four" of the sequential five-step framework established in the SSA regulations, Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). However, "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Melville, 198 F.3d at 51; see, e.g., Shaw, 221 F.3d at 134. SSA regulations provide that an ALJ

> shall inquire fully into the matters at issue and shall receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters. If the administrative law judge believes that there is relevant and material evidence available which has not been presented at the hearing, he may adjourn the hearing or, at any time, prior to the filing of the compensation order, reopen the hearing for the receipt of such evidence.

20 C.F.R. § 702.338.

With respect to "the nature and severity of [a claimant's]

- 20 -

impairment(s)," 20 C.F.R. § 404.1527(d)(2), "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant," Green-Younger, 335 F.3d at 106.  According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); see, e.g., Green-Younger, 335 F.3d at 106; Shaw, 221 F.3d at 134.  "[M]edically acceptable clinical and laboratory diagnostic techniques" include consideration of "[a] patient's report of complaints, or history, [a]s an essential diagnostic tool." Green-Younger, 335 F.3d at 107 (internal quotation marks omitted).

Generally, "the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts," Halloran, 362 F.3d at 32, for "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). However, not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician.  For example, we have found an expert's opinion "not substantial," i.e., "[]not reasonably" capable of "support[ing] the conclusion that [the claimant] c[ould] work" where the expert addressed only "deficits" of which the claimant was "not complaining," Green-Younger, 335 F.3d at 107-08, or where the expert

was a consulting physician who did not examine the claimant and relied entirely on an evaluation by a non-physician reporting inconsistent results, see id., or where the expert described the claimant's impairments only as "[l]ifting and carrying moderate[,] standing and walking, pushing and pulling and sitting mild," giving an opinion couched in terms "so vague as to render it useless in evaluating" the claimant's residual functional capacity, Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000).

Nor is the opinion of the treating physician to be discounted merely because he has recommended a conservative treatment regimen. See, e.g., Shaw, 221 F.3d at 134 (district court erred in ruling that the treating physician's "recommend[ation of] only conservative physical therapy, hot packs, EMG testing--not surgery or prescription drugs--[w]as substantial evidence that [the claimant] was not physically disabled"). The ALJ and the judge may not "impose[] their [respective] notion[s] that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered. . . . [A] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion." Id. at 134-35 (internal quotation marks omitted); see also id. at 134 (Commissioner is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion"). The fact that a patient takes only over-the-counter medicine to alleviate her pain may, however, help to support the Commissioner's conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record, such as the

opinions of other examining physicians and a negative MRI.  See Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995).

In light of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).  Further, "the ALJ must not only develop the proof but carefully weigh it."  Donato v. Secretary of Department of Health & Human Services, 721 F.2d 414, 419 (2d Cir. 1983).

Finally, even when a treating physician's opinion is not given "controlling" weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive.  See 20 C.F.R. § 404.1527(d)(2).  The ALJ must consider, inter alia, the "[l]ength of the treatment relationship and the frequency of examination"; the "[n]ature and extent of the treatment relationship"; the "relevant evidence . . ., particularly medical signs and laboratory findings," supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues.  Id. § 404.1527(d)(2)(i)-(ii), (3)-(5).  See also id. § 404.1527(d) (same factors govern how much weight should be given to any medical opinion).  We note that "[g]enerally, the longer a treating source has treated [the claimant] and the more times [the claimant] ha[s] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion," id. § 404.1527(d)(2)(i)--contrary to Dr. Abeles's suggestion that the opinion of Dr. Smith be discounted on the ground

that "he is being influenced by seeing" Burgess "month [in] and month out" (ALJ Tr. 41).

After considering the above factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion" (emphasis added)). Failure to provide such "'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error").

In the present case, we vacate and remand for further consideration because, given the evidence discussed in Part I.A.1. above as to the condition of Burgess's back, the ALJ failed to give good reasons for not crediting Dr. Smith's opinion that Burgess had a bulging disc "encroaching on the space that is normally there in the nerve root" (WCB Tr. 9), "effectively pinching that nerve each time [Burgess] moves" (id. at 11; see id. at 9 ("every time [Burgess] moves a certain way it drags that nerve root across the dis[c] material and is very painful")). That opinion was given in light of the MRI Report on Burgess's back, showing bulging disc material.

Preliminarily, we note that the ALJ relied in part on the

- 24 -

fact that the treatment recommended for Burgess was conservative, pointing out that there was no recommendation for, inter alia, "stronger pain medication," ALJ Decision at 4, and that the district court endorsed that rationale (see D.Ct. Tr. 16-17 (noting "the lack of more serious treatment than . . . Tylenol and Motrin," which the court felt "was . . . a very limited treatment regime here for someone who purported to be in daily and constant pain")). Dr. Smith, however, had testified before the Workers' Compensation Board as to the appropriateness of the treatment he recommended, stating that given the "long term" nature of Burgess's condition, "there is a limit to how much you can give her." (WCB Tr. 21.) The ALJ and the district court did not appear to have been aware of Dr. Smith's rationale for what he considered to be the appropriate course of treatment, and did not provide "the overwhelmingly compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion," Shaw, 221 F.3d at 135.

More importantly, in relying on Dr. Abeles's statements that there was "no objective reason" why Burgess could not sit, stand, and walk for six hours out of an eight-hour workday (ALJ Tr. 40), the ALJ was unaware of the presence--and contents--of the MRI Report, which was in the administrative record. The MRI Report, as indicated above, was explicitly explained by Dr. Smith at Burgess's Workers' Compensation Board hearing, the transcript of which was also in the administrative record. The MRI Report stated that the MRI performed on Burgess's back revealed an "encroachment of the left neural foramen of L2-3 by what appears to be disc material, producing stenosis in the anterior/posterior direction" (MRI

Report), and Dr. Smith testified at the Board hearing that this was simply another way of saying "that the nerve root [wa]s impinged" (WCB Tr. 11-12 (MRI Report "us[ed] other words that mean the exact same thing")).

The ALJ, however, repeatedly stated that there was no "objective" evidence to support Burgess's claim. ALJ Decision at 4 ("the objective findings of record do not show an impairment which can be reasonably expected to produce the pain alleged" (emphasis added)); id. (Burgess's "complaints suggest a greater severity of impairment than can be shown by the objective medical evidence alone" (emphasis added)); id. at 5 ("no objective reason why [Burgess's] sitting, standing, or walking would be limited" (emphasis added)).

Plainly, the MRI Report was objective evidence, and it was in the record. Dr. Abeles's own opinion was flawed by the fact that he did not examine the key piece of evidence in the record (not realizing that it was in the record); thus the ALJ's reliance on Dr. Abeles's opinion was itself a flaw. And in light of the ALJ's own failures to recognize that the MRI Report was in the record and to give it any consideration, his repeated statements that there was no "objective" evidence to support Dr. Smith's medical opinion were not "good reasons" for disregarding that opinion, and the denial of Burgess's disability claim on that basis was not supported by substantial evidence.

We note that even if the MRI Report had not in fact been in the record before the ALJ, the ALJ should have been aware of its existence given that Dr. Zaretsky mentioned the MRI Report in no

- 26 -

fewer than six of his reports, and Dr. Abeles testified that "[t]here is some mention of an MRI" (ALJ Tr. 38). Although Dr. Abeles went on to say (erroneously) that "there is no report of an MRI of the lumbar spine" (id.), the ALJ, given his duty to develop the record, should have requested that the MRI Report be supplied, rather than simply stating in his decision that "there was no report of findings" in the record, ALJ Decision at 3.

The Commissioner concedes on this appeal that an MRI is a medically acceptable laboratory diagnostic technique, but he argues that the MRI "is not well-supportive of Dr. Smith's opinions." (Commissioner's brief on appeal at 41.) This argument was apparently accepted by the district court, but we reject it for two reasons. First, this plainly was not the basis on which the ALJ denied Burgess's claim, as the ALJ did not know what the MRI Report said. As discussed above, the courts are not permitted to "affirm an administrative action on grounds different from those considered by the agency." Melville, 198 F.3d at 52. Second, the proposed new ground--that the MRI Report does not support Dr. Smith's opinion--is not supported by the record. As noted in Part I.C. above, the district court disagreed with Dr. Smith's medical opinion that the stenosis referred to in the MRI Report meant that the nerve root was being impinged; the court stated that there were "no actual positive nerve findings" and opined that what Dr. Smith meant was that there "could" be nerve impairment and there "could" be pain. (D.Ct. Tr. 15.) But all of Dr. Smith's reports stated that Burgess complained of pain, and Dr. Smith explained the MRI Report in testifying before the Workers' Compensation Board, stating that Burgess "has a nerve

- 27 -

root that _is_ being pushed upon by the dis[c], which _is very painful_." (WCB Tr. 5 (emphases added).) Neither a reviewing judge nor the Commissioner is "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion," Shaw, 221 F.3d at 134, or indeed for any "competent medical opinion," Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998); see id. (ALJ "is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him" or to "engage[] in his own evaluations of the medical findings" (internal quotation marks omitted)).

In sum, the ALJ's conclusion that there was no objective evidence to support Dr. Smith's opinion was unsupported by anything other than the erroneous statement of Dr. Abeles. The MRI Report on Burgess's spine was objective evidence that supported Dr. Smith's opinion as to Burgess's condition. The ALJ's finding that Burgess can return to work as a salesperson--a job that in her past experience had required her to be on her feet for virtually the entire workday--when Dr. Smith opined that the nature and severity of Burgess's impairment are such that Burgess cannot not stand for more than one hour out of eight, and cannot stand for more than 15 minutes at a time, is not supported by substantial evidence.

This conclusion does not, however, entitle Burgess to an outright reversal of the denial of benefits, for there was in the record some evidence that might be viewed as substantially contradicting the opinion of Dr. Smith. We do _not_ include in this category the testimony of Dr. Abeles, who plainly had not read the MRI Report; or the report of Dr. Mancheno who, though mentioning in

- 28 -

the patient history section of his report that Burgess said that she had an "MRI with abnormalities reported," does not appear to have read the MRI Report as he neither mentioned it in the "Laboratories" section of his report nor reflected any awareness of the MRI Report's findings that Burgess had a protruding disc or of Dr. Smith's opinion as to the painful effect of the protrusion. Nor could we view as substantial evidence the box-check forms filled out by the consultants, which betray a lack of awareness of the MRI Report.

However, as discussed in Part I.A.2. above, Dr. Zaretsky examined Burgess 12 times, and his later reports appear to have taken into account the MRI Report's findings with respect to Burgess's spine. He also reported that some of Burgess's complaints of pain in response to his questions at several of his examinations were not credible physiological responses. Dr. Zaretsky concluded that the findings based on the MRI of Burgess's back indicated that she had a mild partial--albeit permanent--disability, and he stated in one of his 12 reports (about a year before his last report) that she was "capable of gainful employment" (Report of Dr. Robert Zaretsky dated January 12, 2000). It is not clear whether or not the permanent partial disability noted by Dr. Zaretsky is consistent with the ALJ's conclusion that Burgess is capable of working six-to-eight hours a day on her feet as a salesperson. We leave it to the ALJ, in the first instance, to determine whether the reports of Dr. Zaretsky, who was not expressly mentioned by the ALJ, should be viewed as substantial evidence contradicting the opinion of Dr. Smith so as to entitle that opinion to less than "controlling"

weight.

On remand, Burgess is entitled to express consideration of the MRI Report as to her back and of Dr. Smith's explanation of the report's findings, and to findings of fact supported by substantial evidence.  If the ALJ declines to give controlling weight to Dr. Smith's MRI-supported opinion as to the nature and severity of her impairment, Burgess is entitled to a comprehensive statement as to what weight is given and of good reasons for the ALJ's decision.

## CONCLUSION

The judgment of the district court is vacated, and the case is remanded to the Commissioner for further proceedings not inconsistent with this opinion.