Rosemarie **DONNELLY**, Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY**, Defendant.

No. 13–CV–4067 (ADS).

United States District Court, E.D. New York.

Signed July 11, 2014.

Grey & Grey, L.L.P., Farmingdale, NY, by Peter Tufo, Esq., Of Counsel, for Plaintiff.

Loretta E. Lynch, United States Attorney, Brooklyn, NY, by Arthur Swerdloff, Assistant United States Attorney, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On or about October 15, 2013, the Plaintiff Rosemarie Donnelly (the "Plaintiff") commenced this action pursuant to the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), challenging a final determination by the Commissioner of Social Security (the "Commissioner"), that she was ineligible for Social Security disability benefits. Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to

Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(c). Also before the Court is the Plaintiff's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

For the reasons set forth below, the Commissioner's motion is granted and the Plaintiff's motion is denied.

## I. BACKGROUND

### A. *Procedural History*

On October 4, 2007, the Plaintiff, who was an employee of the Internal Revenue Service ("IRS"), filed an application for Social Security disability insurance benefits, alleging a disability and inability to work since February 2, 2005 due to herniated discs; a back injury; borderline diabetes; asthma; sleep apnea; and thyroid problems. (Administrative Record ("AR") at 111, 236, 241.) On January 25, 2008, the Social Security Administration ("SSA") denied her application and the Plaintiff made a timely request on June 5, 2008 for a hearing before an Administrative Law Judge ("ALJ"). (AR 127–32.)

On June 18, 2009, a hearing was held before ALJ Seymour Raynor. (AR at 106–10.) The Plaintiff requested an adjournment to obtain counsel, and ALJ Raynor held a second hearing on September 8, 2009. (AR 106–10.) At this second hearing, the Plaintiff was represented by counsel. (AR at 112–22.) Only the Plaintiff testified. (AR at 106–10.)

Following the hearing and a review of the record, in a decision dated September 29, 2009, ALJ Raynor denied the Plaintiff's claim for disability benefits. (AR at 121.) He acknowledged that the Plaintiff was unable to sit for more than two hours and was also unable to perform her past relevant work. (AR at 118.) Nevertheless, he found that the Plaintiff retained the residual functional capacity ("RFC") to perform the full range of light work due to her

vocational background, as defined in 20 C.F.R. § 404.1567(b). (AR at 118).

On May 4, 2011, the Plaintiff, through her attorney, sought review of ALJ Raynor's decision by the Appeals Council. (AR at 161–62.) On May 18, 2011, the Appeals Council vacated ALJ Raynor's decision and remanded the case. (AR at 123–26.) The Appeals Council noted that ALJ Raynor's decision was lacking in that (1) it did not contain an adequate evaluation of the opinion of the Plaintiff's treating physician and (2) it did not contain any evaluation of the Plaintiff's obesity. (AR at 124.)

On January 24, 2012, another hearing was held before ALJ Raynor. (AR 67–103). The Plaintiff and a vocational expert, Dr. David Vandergoot, testified. (AR 67–103.)

About one month later, on February 21, 2012, ALJ Raynor issued a new decision. He held that the Plaintiff had the RFC to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). (AR 67–103). Moreover, he determined that the Plaintiff was now capable of sitting; standing; walking six hours within an eight hour workday; and lifting and carrying twenty pounds. (AR at 9–27.) As such, he found her to be capable of performing her prior relevant work experience. (AR 9–27).

On May 22, 2013, when the Appeals Council denied the Plaintiff's request for review, the Plaintiff commenced the present appeal from ALJ Raynor's February 21, 2012 decision. (AR 1–6).

### B. *The Administrative Record*

#### 1. The Plaintiff's Non–Medical Background

The Plaintiff was born on April 6, 1963 and is fifty-one years of age. (AR at 35.) She attended a two-year college, which the

Court concludes was completed in 1984, notwithstanding a minor discrepancy in the record. (AR at 35, 70). In 1985, the Plaintiff began her work as a mail clerk for the IRS. (AR at 37, 70.)

For approximately twenty years, from 1985 through 2005, the Plaintiff worked for the IRS. (AR at 36.) During her last four years at the IRS, from 2001 until 2005, the Plaintiff was employed doing customer service duties and then briefly as a tax examiner. (AR at 36, 72.) The Plaintiff worked eight hours a day, five days a week and was required to sit for a total of seven hours a day, with minimal standing or lifting. (AR at 262.) The heaviest weight the Plaintiff lifted was her papers or notebooks. (AR at 262.) Despite another minor discrepancy in the record, it appears to the Court that on or about February 2, 2005, the Plaintiff permanently ceased working at the IRS. (AR 38, 70–71.)

### 2. The Plaintiff's Medical Background Prior to the Onset Date of February 2, 2005

On June 23, 1999, the Plaintiff was examined by cardiologist Mark G. Borek, M.D. ("Dr. Borek"). Dr. Borek noted that the Plaintiff had been smoking three packs of cigarettes per day, until two weeks prior to her visit, when she decreased her smoking habit to five cigarettes per day. (AR at 1043). Due to her chronic shortness of breath and obesity, Dr. Borek recommended a stress test and Doppler echocardiogram. (AR at 1043).

On June 29, 1999, cardiologist Dr. Brian S. Geller ("Dr. Geller") performed the Doppler echocardiogram, which demonstrated normal ventricular function, with only trace forms of regurgitation. (AR at 1041.) He recommended weight-loss and exercise, along with the cessation of her smoking habit. (AR at 1192.)

### 3. The Plaintiff's Medical Background After the Onset Date of February 2, 2005

On February 2, 2005, the Plaintiff apparently injured herself when a chair in which she was attempting to sit had broken. (AR at 601–02.) Following this accident, the Plaintiff allegedly began to suffer from headaches, neck pain, and lower back pain. (AR 601–02).

On February 3, 2005, the Plaintiff was seen by chiropractor James H. Lambert, D.C. ("Dr. Lambert"). (AR at 601–02). Dr. Lambert diagnosed the Plaintiff with (1) cervicalgia or neck pain; (2) cervicocranial syndrome or misalignment of the cervical vertebrae; (3) cervical sprain and strain; (4) lumbosacral sprain and strain; (5) lumbar spine pain; and (6) muscle spasms. (AR at 601.) All of these conditions could cause neck and back pain. (AR 601). The Plaintiff continued to receive chiropractic treatment approximately two to three times per week between July 18, 2005 and February 29, 2008. (AR at 364–65, 369–72, 374–77, 394–95, 399–406, 412–16, 418–20, 440–41, 444–45, 449–51, 453, 473–74, 481–82, 490–95, 504–07, 523–26, 533–36, 540–43, 548–49, 554, 562–76, 578–82, 585–86, 596, 712, 714).

In addition, the Plaintiff visited pulmonologist Jason B. Karp, M.D. ("Dr. Karp"), of North Shore Pulmonary Associates, P.C., on several occasions between July 25, 2005 and October 21, 2005 and continued to see him on many occasions thereafter. (AR at 350, 738, 759, 760–62.) During her visits with Dr. Karp, the Plaintiff complained of shortness of breath and decreased energy. (AR at 761.) Although the Plaintiff was overweight, Dr. Karp noted that she was not in any apparent distress. (AR at 761.)

The Plaintiff also had a rare end-expiratory wheeze. (AR at 738.) However,

upon a pulmonary examination on October 21, 2005, Dr. Karp concluded that the Plaintiff's pulmonary function was normal and her CT scan was "clinically unremarkable." (AR at 738.) Also, the Plaintiff underwent a methyl choline challenge study, and the findings were consistent with asthma. (AR at 738.) Dr. Karp recommended that the Plaintiff lose weight and stop smoking. (AR at 738–41.) He prescribed her an inhaler and the medication Singulair for her wheezing. (AR at 738, 762.)

On November 8, 2005, the Plaintiff saw neurologist Richard A. Pearl, M.D. ("Dr. Pearl"), due to a complaint of lower back pain that radiated down her right leg. (AR at 334–35). The Plaintiff walked with an antalgic gait in order to avoid pain. (AR at 335.) At her examination, the Plaintiff exhibited full 5/5 motor function, except that she did not resist well upon dorsiflexion of the foot, which Dr. Pearl noted could have been the result of pain rather than weakness. (AR at 335.)

Dr. Pearl diagnosed the Plaintiff with lumbosacral radiculopathy, which is radicular pain of the lower back. (AR at 330.) One week later, on November 15, 2002, an MRI of the Plaintiff's lumbosacral spine indicated active left L5 radiculopathy, a disorder of the L5 nerve root. (AR at 326–29, 31, 33.)

On December 8, 2005, the Plaintiff returned to Dr. Pearl, complaining, as she did the month before, of lower back pain that radiated down her right leg. (AR at 588, 673, 696.) Dr. Pearl observed that the Plaintiff was hypothyroid. (AR at 325). He again diagnosed her condition as lumbosacral radiculopathy, with a left-sided herniated disc. (AR at 325.) Continued chiropractic care was recommended. (AR at 325.) On January 25, 2006, the Plaintiff returned to see Dr. Pearl, complaining of the same pain. (AR at 324.)

Dr. Pearl diagnosed the Plaintiff with chronic lumbosacral radiculopathy. (AR at 325.)

The Plaintiff visited Dr. Karp again on January 19, 2006 and April 20, 2006, and during both visits, the pulmonary function testing was normal. (AR at 738, 739, 755, 757.)

On February 10, 2006, the Plaintiff saw neurologist Samir Haddad, M.D. ("Dr. Haddad"), complaining of lower back pain. (AR 423–33.) Dr. Haddad diagnosed cervicalgia and severe lumbar radiculopathy. (AR 432–33.) He prescribed Mobic and Soma and planned to start the Plaintiff on trigger point injections. (AR at 432–33.)

On August 22, 2006, the Plaintiff saw orthopedic surgeon Wayne Kerness, M.D. ("Dr. Kerness") for a consultative examination. (AR at 496–503.) Dr. Kerness observed that the Plaintiff was not in acute distress and walked without assistance. (AR at 498.) During moments when the Plaintiff was not directly being observed, she turned her head, walked, performed routine activities, and was able to get on and off the examination table without difficulty. (AR at 498.)

During this visit on August 22, 2006, Dr. Kerness noted that the Plaintiff was 5 foot 4 inches tall and weighed 260 pounds. (AR at 498.) Furthermore, he noted that the cervical and lumbar sprains and strains were resolved because there were no spasms or tenderness of the cervical or thoracic spines, and the lumbar spine did not exhibit tenderness or spasm. (AR at 498–99.) Dr. Kerness observed that the Plaintiff's muscle strength was a full 5/5, and he noted that the Plaintiff did not have any disability. (AR at 499.)

On September 13, 2006, the Plaintiff returned to the neurologist, Dr. Haddad with a new complaint of right shoulder pain. (AR at 427.) Dr. Haddad's examination of

the Plaintiff revealed one trigger point of tenderness in her shoulder, and Dr. Haddad injected that area. (AR at 485.) One month later, on October 16, 2006, Dr. Haddad wrote that he was treating the Plaintiff for injuries sustained in the February 2, 2005 accident and that the Plaintiff was totally disabled. (AR at 429.)

On October 16, 2006, Dr. Lambert conducted a chiropractic examination of the Plaintiff. (AR at 430.) He concluded that the Plaintiff was disabled and unable to work but did not specify the reasons for this finding of full disability. (AR at 430.)

On November 30, 2006, the pulmonologist, Dr. Karp examined the Plaintiff and the examination was entirely normal, except for her obesity. (AR at 739.)

Between October 18, 2006 and February 7, 2007, the Plaintiff visited Dr. Haddad four times. (AR at 421, 439, 442–43, 448, 452, 475, 452.) Dr. Haddad observed that the Plaintiff had good and bad days with her shoulder, particularly at the trigger point of tenderness, C7. (AR 472.) The Plaintiff also complained of headaches and right-sided neck and shoulder pain, for which Dr. Haddad gave her two trigger point injections on December 1, 2007. (AR at 448.)

On February 7, 2007, the Plaintiff complained to Dr. Haddad of excruciating right shoulder pain, and he prescribed Celebrex and a shoulder sling. (AR at 421). She subsequently visited Dr. Lambert on February 13, 2007, and the chiropractor, once again, asserted that the Plaintiff was disabled and unable to work. (AR at 426).

On May 8, 2007, the Plaintiff visited orthopedic surgeon Michael J. Katz, M.D. ("Dr. Katz") for a consultative examination. (AR at 378–82.) She complained of lower back pain when bending. (AR 378–82.) Dr. Katz observed the Plaintiff walk quickly and without assistance into and out of the examination room. (AR 379.) The Plaintiff asked Dr. Katz for assistance to rise from the examination table, but "it was clear [to Dr. Katz] that she was not exerting any effort at all in order to get up on her own." (AR at 381.) Dr. Katz found the Plaintiff's complaints with respect to her injuries to be "quite vague." (AR 381.)

Upon his examination of the Plaintiff, Dr. Katz observed no tenderness or spasm of the Plaintiff's cervical spine (AR at 379.) He further observed that the Plaintiff's motor strength was fully intact. (AR at 379.) The Plaintiff was able to rotate her shoulder forty-five degrees, with no impingement at ninety degrees. (AR at 380.) Dr. Katz concluded that the lumbosacral strain was resolved and that physical therapy and orthopedic care was no longer necessary. (AR at 381.) In addition, on a material issue in this case, he asserted that the Plaintiff could perform her sedentary job as a tax examiner without restriction, and she was not disabled. (AR at 381, 382.)

On June 12, 2007, the Plaintiff returned to Dr. Karp, as she continued to smoke a quarter-pack of cigarettes a day. (AR at 739.) Dr. Karp concluded that her pulmonary function was essentially normal and that she should undergo a sleep study. (AR at 739.)

On September 12, 2007, the Plaintiff visited the neurologist, Dr. Haddad complaining of persistent neck and back pain, which was treated with therapy and chiropractic treatment. (AR at 337.) Dr. Haddad asserted that the Plaintiff was totally disabled. (AR at 373.) In an "Updated Medical Narrative," written that day, September 12, 2007, Dr. Haddad noted that the Plaintiff's symptoms had worsened over time. (AR 336–37.) In this regard, he found that her hand grip and motor strength had decreased to 4/5 and that her

muscle strength was weak in the cervical and lumbar spines and right shoulder. (AR at 337.) He recommended consistent physical therapy and continued chiropractic treatment. (AR at 337.)

A September 24, 2007 examination of the Plaintiff by Dr. Karp revealed normal pulmonary findings, and Dr. Karp noted that his diagnoses were obesity; asthma; GERD, non-allergic rhinitis; hypothyroidism; an abnormal CT scan of the chest; and obstructive sleep apnea syndrome. (AR at 739.) While Dr. Karp wrote that these conditions were not disabling, he noted that he was not qualified to discuss the impact of the Plaintiff's orthopedic impairments on her ability to work. (AR at 739.)

On both September 26, 2007 and October 5, 2007, the Plaintiff visited Dr. Haddad complaining of chronic headaches and neck pain. (AR at 366, 765.) Upon examination, the Plaintiff's trigger point of tenderness was the right C2 vertebra and trapezius, for which Dr. Haddad gave her injections. (AR at 366, 765.)

On November 10, 2007, Dr. Karp filled out a medical questionnaire, noting the Plaintiff's diagnoses of asthma and obstructive sleep apnea. (AR at 338–42). He further noted that her muscle fatigue was related to her obesity and sleep apnea. (AR at 338–42). According to Dr. Karp, the Plaintiff had no limitations with respect to sitting and standing up to six hours per day, but she was to have limited contact with dust, odors, and chemicals. (AR at 338–42.) Dr. Karp noted that he could not determine the Plaintiff's ability to perform work-related activities. (AR at 615.)

On January 17, 2008, the Plaintiff visited internist Tasneem Sulaiman, M.D. ("Dr. Sulaiman"), for a consultation. (AR 616–24.) The Plaintiff complained of shortness of breath when performing daily activities and of headaches and back pain that sometimes radiated to her legs. (AR at 616.) Dr. Sulaiman observed that the Plaintiff walked normally, without difficulty or assistance. (AR at 617.) Further, he noted that the Plaintiff rose from a chair without difficulty, and also her lungs were clear. (AR at 618.) An examination of the Plaintiff revealed full range of motion, with full 5/5 strength. (AR at 618.) Dr. Sulaiman diagnosed a history of asthma; hypothyroidism; back pain without radiculopathy; headaches; and a history of sleep apnea. (AR 620–23.)

In a letter dated February 4, 2008, the United States Office of Personal Management advised the Plaintiff that it had determined that she was disabled from her tax examiner position as a result of lumbar disc herniation with L5 radiculopathy and right shoulder rotator cuff syndrome with a partial tear. (AR at 683.)

The Plaintiff had additional visits with pulmonologist, Dr. Karp on January 22, 2008, March 8, 2008, July 11, 2009, October 23, 2009 and July 2, 2010. (AR at 720–22, 723, 726–27, 1106–08, 1109–11.) On all five occasions, the Plaintiff's pulmonary function was normal. (AR at 723, 720–22, 726–27, 1106–08, 1109–11.)

On February 29, 2008, on the referral of Dr. Haddad, an electromyogram ("EMG") and nerve conduction velocity ("NCV") test was performed on the Plaintiff. (AR at 648–52.) The tests indicated that there was mild right-sided L5 radiculopathy. (AR at 648–52).

On June 10, 2009, the Plaintiff visited orthopedist Joseph P. Stubel, M.D. ("Dr. Stubel"), for a consultation. (AR at 716–17). During the visit, the Plaintiff's cervical spine was tender, with spasm noted. (AR at 716.) The probing of the cervical nerve root produced no symptoms of radiculopathy, and there was full 5/5 motor

strength in both of the Plaintiff's arms. (AR at 717.) X-rays of the Plaintiff's cervical spine were largely normal, except for cervical lordosis, an inward curvature. (AR at 717). X-rays of the lumbosacral spine were normal, and Dr. Stubel's diagnosis was neck and back sprains, for which he advised physical therapy. (AR at 718–19.)

On August 17, 2009, the Plaintiff returned to Dr. Stubel, complaining of back pain and headaches. (AR at 803.) Dr. Stubel's examination of the Plaintiff revealed some tenderness, but her reflexes, sensation, and strength remained normal. (AR at 803.)

On August 21, 2009, an MRI of the Plaintiff's lumbar spine showed "a left lateral disc herniation encroaching the inferior aspect of the left neural foramen with no mass effect upon the exiting nerve root." (AR at 806.) "[T]here [was] a small concentric disc bulge and facet hypertrophy with ligamentum flavum infolding resulting in mild spinal canal stenosis." (AR at 806.)

Dr. Stubel examined the Plaintiff again on August 31, 2009. (AR at 802.) The examination revealed "some mild tenderness of the neck and back," with some restriction of motion. (AR at 802.) The Plaintiff's reflexes, sensation, and muscle strength were normal, and Dr. Stubel described the lumbar and cervical MRIs as showing "degenerative changes." (AR at 802.)

On September 28; 2009, after the Plaintiff complained of shortness of breath and easy fatigability, an echocardiogram was performed. (AR at 992–93.) The results were essentially normal. (AR at 992–93.)

On August 31, 2010, the chiropractor, Dr. Lambert reevaluated the Plaintiff and asserted that she had a permanent disability and expected her to have permanent loss of motion. (AR at 800.)

**4. Evidence After December 31, 2010 (Date Last Insured)**

The Plaintiff, who ceased working on February 2, 2005 after having worked for the IRS for twenty years, was last insured on December 31, 2010. As such, this was the last date on which the Plaintiff may show that she was disabled from her work in order to qualify for Social Security disability benefits. *See Silverman v. Colvin,* 13–CV–3062, 2014 WL 198767, at *3, 2014 U.S. Dist. LEXIS 5798, at *9 (E.D.N.Y. Jan. 16, 2014) ("For someone who works continuously for at least five years and then totally stops working, ... the person must have last worked at most five years before the date of application [in order to be eligible for Social Security disability benefits]. The final day of the final quarter satisfying these requirements is referred to as the 'date last insured.' ").

Following the date the Plaintiff was last insured, on June 1, 2011, an MRI of the Plaintiff's cervical spine showed (1) "mild bilateral C3–C4 and moderate right C4–C5 neural foraminal narrowing"; (2) "C5–C6 disc osteophyte complex [that] result[ed] in stable effacement of the ventral thecal sac and unchanged mild left neural foraminal stenosis"; and (3) "a new small focus of T2 hyperintensity ... within the spinal cord just below the C2–C3 level." (AR 794–95.) "No new disc herniation or stenosis" was noted, and an MRI of the Plaintiff's thoracic spine revealed minimal disc bulging at T2–T3, without significant stenosis. (AR at 792, 795.)

An MRI of the Plaintiff's lumbar spine showed stable L4–L5 disc bulging and "a left far lateral disc herniation that contact[ed] the exiting L4 nerve root with mild left neural foraminal stenosis." (AR at 796–97.) The MRI also revealed new

L5–S1 disc bulging with "new central disc herniation," resulting in mild narrowing of the spinal canal. (AR at 797.)

Dr. Haddad prescribed Lidocaine patches for the Plaintiff's complaints of lower back pain, and on August 12, 2011, he administered trigger point injections. (AR at 835.) On a medical questionnaire dated October 3, 2011, Dr. Haddad indicated that the Plaintiff had a lumbar disc herniation at L4–L5 and at L5–S1 and a cervical disc bulge at C4–C5 and at C5–C6. (AR at 837.) He further indicated that the Plaintiff's pain was frequent and severe enough to interfere with attention and concentration and that she could not stand beyond one minute nor sit beyond twenty-five minutes. (AR at 838). Dr. Haddad added that during an eight-hour workday, the Plaintiff could sit, stand, and walk for less than two hours each. (AR at 839.)

### 5. January 17, 2008 Surveillance and Observation

On January 17, 2008, the Cooperative Disability Investigation (the "CDI") unit of the SSA Inspector General observed the Plaintiff drag an empty trash can from the curb to a spot nearer to her home. (AR at 627, 629.) The Plaintiff then bent a few degrees to get mail from her mailbox, and also got into her car and pulled the door open widely, with apparent ease. (AR at 627.) While under observation, the Plaintiff appeared to have a normal gait and got out of her car with ease, and she did not seem out of breath. (AR at 627.)

### 6. The Plaintiff's Testimony at the 2009 Hearing

At the September 8, 2009 hearing, the Plaintiff alleged that the primary reason for her disability was neck and back pain, caused by muscle spasms. (AR at 45.) She stated that she became disabled on February 2, 2005 due to her neck, back,

and leg injury when she fell back in her chair. (AR at 73.) She also stated that she later experienced right arm injury due to the examination technique of a doctor who examined her with regard to her Workers' Compensation claim. (AR at 42.) In addition, the Plaintiff complained that her sleep apnea caused her to sleep with a CPAP machine every night and that she had shortness of breath when she walked too quickly, climbed stairs, or spoke very fast. (AR at 43–44.)

The Plaintiff further testified that she rarely shopped, did not cook for herself, and could not launder clothes or vacuum. (AR at 53–55.) She stated that her daughter took out the garbage. (AR at 56.) She also admitted that she had recently traveled 12.5 hours from New York to North Carolina, unassisted, via Amtrak. (AR at 49–50.) However, according to the Plaintiff, she said that this trip was possible because she was able to alternate between sitting and standing. (AR at 49–50.)

### 7. The ALJ's 2009 Findings

On September 29, 2009, ALJ Raynor issued his initial decision (AR at 115–22.) ALJ Raynor addressed whether the Plaintiff was disabled under sections 216(i) and 223(d) of the Act. (AR. at 115.) He also noted that in order for the Plaintiff to be entitled to a period of disability and disability insurance benefits, the Plaintiff was required under sections 216(i) and 223 of the Act to establish that she was disabled on or before December 31, 2010, which, as stated above, was the date she was last insured for disability insurance benefits. (AR at 115.) ALJ Raynor determined that the Plaintiff was not disabled under sections 216(i) and 223( ) of the Social Security Act. (AR at 122).

In particular, ALJ Raynor found as follows:

1. The [Plaintiff] [met] the insured status requirements of the Social Security Act [as she was insured] through December 31, 2010.

2. The [Plaintiff] did not engage in substantial gainful activity since February 2, 2005, the alleged onset date.

3. The [Plaintiff] had the following severe impairments: disc herniations of the lumbar spine, lumbar radiculopathy, hypothyroidism, obesity, and asthma.... The [Plaintiff's] impairments [ ] result[ed] in significant limitations of exertional ability and consequently ... [had] more than a minimal effect upon the [Plaintiff's] work ability.

4. The [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404.... The [Plaintiff] [had] a disorder of the spine but there [was] no evidence of nerve root compression, arachnoiditis or stenosis. Therefore, there [was]. no basis for finding that the [Plaintiff's] back impairment meets or equals the medical criteria of a listed impairment ...

5. ... The [Plaintiff] [had] the residual functional capacity to perform the full range of light work ....

6. The [Plaintiff] was unable to perform any past relevant work [as an IRS tax examiner].....

7. The [Plaintiff] was born on April 6, 1963 and was 41 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date.

8. The [Plaintiff] [had] at least a high school education and [was] able to communicate in English. The [Plaintiff] ... completed two years of college.

9. Whether the [Plaintiff] [had] transferable work skills [was] not relevant because it would not change the outcome....

10. Considering the [Plaintiff's] age, education work experience, and residual functional capacity, the [Plaintiff] [had] acquired work skills from past relevant work that [were] transferable to other occupations with jobs existing in significant numbers in the national economy.

(AR at 117–122, citations omitted.)

In this decision, ALJ Raynor explained that "the [Plaintiff] has past relevant work as an IRS tax examiner," which "involve[d] primarily sitting." (AR at 121.) As such, because he "accept[ed] the [Plaintiff's] contention that she [had] a limitation of her ability to sit and [had] the capacity to sit no more than a total of two hours in an eight-hour workday[,] ALJ Raynor determined that the [Plaintiff] [was] unable to perform her past relevant work." (AR at 121.)

ALJ Raynor placed weight on the fact the Plaintiff was seen dragging a trash can from the curb of her home, closing and pulling the car door with apparent ease, and walking with a normal gait and pace. (AR at 119.) He also focused on Dr. Karp's analysis that the Plaintiff did not have any pulmonary limitations, except relating to her obesity. (AR at 119.)

However, ALJ Raynor did not acknowledge the findings of Dr. Haddad, one of the Plaintiff's treating physicians. (AR at 118–21.) Moreover, he noted that he would not give significant weight to the findings of the chiropractor who treated the Plaintiff. (AR at 120.)

Rather, ALJ Raynor looked to the Plaintiff's vocational profile in order to determine if she was disabled. (AR at 121.) He held that, although the Plaintiff could sit for only two hours at a time and stand for six hours at a time, the Plaintiff's "residual functional capacity, age, education, and work experience in conjunction with the Medical–Vocational Guidelines" rendered the Plaintiff not disabled. (AR at 122.)

### 8. The Appeals Council's May 18, 2011 Order

On May 18, 2011, the Appeals Council issued an order vacating ALJ Raynor's September 29, 2009 decision and remanding the Plaintiff's case. (AR at 124–25.) In this regard, the Appeals Council noted that ALJ Raynor failed to evaluate the treating source opinion of Dr. Haddad. (AR at 124.) In addition, the Appeals Council noted that ALJ Raynor failed to include an analysis of the Plaintiff's obesity, particularly with respect to whether it was a severe impairment. (AR at 124.)

The Appeals Council instructed that upon remand, the ALJ should (1) "[o]btain updated medical records concerning all of the [Plaintiff's] impairments in order to complete the administrative record in accordance with the regulatory standards regarding existing medical evidence[,]" including "notes from her treating sources and medical source statements about what she can still do despite [her] impairments"; (2) "[g]ive further consideration to the [Plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of the record in support of assessed limitations," which should involve "further evaluat[ion] [of] the medical opinion of Dr. Haddad … and [an] [explanation] [of] the weight given to such opinion evidence"; and (3) "[o]btain supple-

mental evidence from a vocational expert to clarify the effect of the assessed limitations on the [Plaintiff's] occupational base." (AR at 125.)

### 9. The Plaintiff's Testimony at the 2012 Hearing

Following the Appeals' Council remand of May 18, 2011, another hearing was held on January 24, 2012. During this hearing, the Plaintiff testified that she still experienced neck and back pain daily and that she could not sit for more than a half hour; walk for more than twenty minutes; or stand for more than five minutes. (AR 79–81.) The Plaintiff also testified that she made another trip to North Carolina for a vacation with her sister, who drove more than ten hours each way, back and forth from Long Island. (AR at 87.) The Plaintiff asserted that she could dress herself, shower, and brush her hair, but that she could not launder clothes, sweep, or vacuum. (AR 88–89). The Plaintiff noted that she did not use a cane, back brace, or neck collar. (AR 86–87.) She drove herself to the hearing, and she testified that she could climb stairs but with shortness of breath. (AR at 91.) In addition, the Plaintiff testified that she went to the bank, post office, ate in restaurants with her family, and shopped. (AR at 88, 91, 94.)

Dr. David Vandergoot ("Dr. Vandergoot"), a vocational expert, also testified, "as ordered by the Appeals Council." (AR at 20, 69, 98–102.) According to Dr. Vandergoot, the Plaintiff's occupational skills included using keyboard equipment and record keeping systems. (AR at 99.) He classified the Plaintiff's previous positions with the IRS as semi-skilled, "light positions," and testified that a person with an RFC to lift ten pounds regularly and to lift twenty pounds occasionally would be able to continue to perform such work. (AR at

99–100.) In addition, Dr. Vandergoot stated that other similar jobs existed in the national economy, such as clerical positions that were either sedentary or light positions. (AR at 100.) These jobs included schedule clerk, payroll or timekeeper clerk and claims clerk, all of which were semi-skilled positions. (AR at 100–01.)

However, Dr. Vandergoot also considered a hypothetical situation involving an individual of the Plaintiff's age and with the Plaintiff's work experience, who suffered from pain in the neck and the back and asthma and who had limitations with respect to only being able to sit for twenty-five minutes at a time; to stand for five minutes at a time; and to sit and stand for less than two hours in an eight-hour work day. (AR at 102.) He testified that such a person would not be able to perform the Plaintiff's past relevant work and would not be able to perform any other jobs existing in substantial numbers in the local and national economy. (AR at 102.)

**10. The ALJ's 2012 Findings**

On February 21, 2012, ALJ Raynor issued a decision following the January 24, 2012 hearing. (AR at 12–20.) As he did in the 2009 decision, ALJ Raynor considered whether the Plaintiff was disabled under sections 216(i) and 223(d) of the Act and stated that the Plaintiff was required to establish that she was disabled on or before December 31, 2010, the date she was last insured, in order to be entitled to a period of disability and disability insurance benefits. (AR at 12.) Again, ALJ Raynor determined that the Plaintiff was not disabled under sections 216(i) and 223(d) of the Act. (AR at 12.)

In particular, the ALJ found that:

1. The [Plaintiff] last met the insured status requirements of the Social Security Act on December 31, 2010.

2. The [Plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of February 2, 2005 through her date last insured of December 31, 2010 . . .

3. Through the date last insured, the [Plaintiff] had the following severe impairments: lumbar disc herniations, hypothyroidism, and obesity. The above impairments caused more than minimal limitation in the [Plaintiff's] ability to perform basic work activities . . . .

4. Through the date last insured, the [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . .

5. . . . . [T]he [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) in that the [Plaintiff] [could] sit, stand and walk eight hours in an eight hour day and lift/carry twenty pounds . . . .

6. Through the date last insured, the [Plaintiff] was capable of performing past relevant work as an IRS agent and Clerical work. This work did not require the performance of work-related activities precluded by the [Plaintiff's] residual functional capacity . . . .

7. The [Plaintiff] was not under a disability, as defined by the Social Security Act, at any time from February 2, 2005, the alleged onset date, through December 31, 2010, the date last insured.

(AR at 14–20, citations omitted.)

ALJ Raynor explained that the Plaintiff's testimony at the hearing "was not

indicative of total disability." (AR at 15.) In this regard, the Plaintiff admitted to being "able to engage in a full range of daily activities including driving, showering and bathing herself, dressing independently, and taking care of her ten year old daughter, including preparing meals for her and getting her on the bus." (AR at 15.) She was also "able to grocery shop, [do] some cooking, visit[ ] family, use[ ] the computer, watch[ ] television and ... maintain her own finances." (AR at 15.) Therefore, ALJ Raynor concluded that while "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms[,][ ] the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were inconsistent with the [ ] residual functional capacity assessment [that the Plaintiff could perform light work]." (AR at 15–16.)

In addition, ALJ Raynor examined the analysis of treating physician Dr. Haddad. (AR at 17.) He noted that, "[a]lthough Dr. Haddad indicate[d] that [the Plaintiff] [was] disabled from her past relevant work, he [did] not specify whether she [could] perform other work[.]" (AR at 17.) For this reason, ALJ Raynor gave Dr. Haddad's opinion on the subject little weight. (AR at 17.) ALJ Raynor further found that Dr. Haddad's opinion that the Plaintiff "could sit, stand and walk two hours in an eight-hour day and lift/carry less than ten pounds occasionally ... [was] not consistent with other opinions contained in the record or with the substantial evidence of record." (AR at 17.) As such, ALJ Raynor "accord[ed] little weight to [this] opinion" as well. (AR at 17.)

ALJ Raynor then gave "considerable weight" to consulting orthopedic surgeon Dr. Katz, who "reported that the [Plaintiff] did not complain of any painful condi-

tions[ ] and assessed that the [Plaintiff] would be able to perform work at a sedentary capacity." (AR at 17.) Moreover, ALJ Raynor pointed out that Dr. Katz considered the Plaintiff's "lumbosacral radiculopathy [to be] resolved." (AR at 17.) According to ALJ Raynor, Dr. Katz's opinion deserved to be accorded considerable weight because he "reviewed the [Plaintiff's] medical history and [ ] his findings [were] consistent with the totality of medical evidence[.]" (AR at 17.)

In addition, ALJ Raynor noted that (1) Dr. Kerness, who examined the Plaintiff in August of 2006, found that the Plaintiff could work without restriction and (2) Dr. Karp, who treated the Plaintiff on many occasions since 2005, assessed that the Plaintiff "had no limitations for sitting and could stand/walk up to six hours in an eight-hour day." (AR at 17–18.) ALJ Raynor determined that the opinions of both Dr. Kerness and Dr. Karp were "consistent with the substantial evidence of record," and thus, he accorded "considerable weight" and "great weight" to their opinions, respectively. (AR at 18.)

ALJ Raynor also gave "some weight" to the opinion of Dr. Sulaiman, who was a consulting physician for the SSA. (AR at 19.) In this regard, "[a]lthough Dr. Sulaiman only assessed the [Plaintiff] once," ALJ Raynor found that "his opinion [was] consistent with the evidence of record." (AR at 19.) Dr. Sulaiman opined "that the [Plaintiff] had no limitations for sitting, standing and walking; and that her overall exertion capabilities appear[ed] to be more than moderate exertion." (AR at 19.)

In concluding that the Plaintiff was not disabled, ALJ Raynor pointed out that the medical evidence supported an above residual functional capacity (AR at 20.) He also highlighted the reports of the CDI Unit, which had observed the Plaintiff on January 18, 2008 as "having a normal gait,

station and pace, with fluid movements and no signs of shortness of breath or any physical pain or discomfort." (AR at 19.) ALJ Raynor held that the Plaintiff was able to "perform a full range of activities of daily living, including some cleaning, shopping, taking care of her daughter, preparing meals, and taking care of her dog." (AR at 20.) Furthermore, based on the testimony of Dr. Vandergoot, ALR Raynor determined that the Plaintiff was able to perform her prior work as an IRS agent. (AR at 20.) Accordingly, he held that the Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from February 2, 2005, the alleged onset date, through December 31, 2010, the date last insured (20 CFR 404.1520(f))." (AR at 20.)

## II. DISCUSSION

### A. *Standard of Review*

An unsuccessful claimant for Social Security benefits may bring an action in federal district court to obtain judicial review of the denial of his benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g); *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir.2003); *Brown v. Apfel,* 174 F.3d 59, 61–62 (2d Cir.1999); *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). Substantial evidence is "more than a mere scintilla," *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), and requires such relevant evidence that a reasonable person "might accept as adequate

to support a conclusion." *Burgess v. Astrue,* 537 F.3d 117, 127 (2d Cir.2008).

In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques; results from frequent examinations; and is consistent "with the other substantial evidence in [the] case record." *See Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the weight he gives the claimant's treating source's opinion." *Id.*

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983). Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark,* 143 F.3d at 118. Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984)). A reviewing court may "enter upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decisions of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### B. Analytical Framework for Determining Disability

To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a plaintiff must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir.2004). The Act also provides that the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.*

Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims, including: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" medically determinable physical impairment which will impair the claimant from doing basic work activities; (3) whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in Appendix 1 of the regulations; (4) an assessment of the claimant's residual functional capacity and ability to continue past relevant work despite severe impairment; and (5) an assessment of the claimant's residual functional capacity along with age, education, and work experience. As to the last stage of the inquiry, the burden shifts to the ALJ to show that the claimant can perform alternative work. *See* 20 C.F.R. §§ 404.1520, 416.920.

 When proceeding through this five step analysis, the ALJ must consider the objective medical facts; the diagnoses or medical opinions based on these facts; the subjective evidence of pain and disability; and the claimant's educational background, age, and work experience. *Brown v. Appfel,* 174 F.3d 59, 62 (2d Cir.1999).

### C. In the 2012 Decision, the ALJ Adhered to the Five–Step Sequential Evaluation

As an initial matter, the Court finds that ALJ Raynor adhered to the regulatory five-step sequential evaluation. First, ALJ Raynor found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of February 2, 2005 through December 31, 2010, the date she last met the insured status requirements of the Act. Second, ALJ Raynor found that the medical evidence established that on or prior to December 31, 2010, the Plaintiff had a severe medically determinable physical impairment, which he listed as "lumbar disc herniations, hypothyroidism and obesity." (AR at 14.)

Third, ALJ Raynor determined that the Plaintiff's impairment, or combination of impairments, did not meet or equal in severity the clinical criteria of any impairment listed in Appendix 1 of the regulations. Fourth, ALJ Raynor evaluated the Plaintiff's RFC and found that on or prior to December 31, 2010, she remained capable of performing light work that involved sitting, standing and walking eight hours in an eight-hour day and lifting or carrying twenty pounds at a time. Consequently, ALJ Raynor concluded that considering age, education, work experience, and RFC, the Plaintiff was capable of performing her past relevant work as an IRS agent and clerical work and, therefore, was not afflicted by a disability as defined under the Act.

Accordingly, the ALJ applied the correct legal standard.

### D. The ALJ's Findings are Supported by Substantial Evidence

 The Court also finds that ALJ Raynor's decision was supported by substan-

tial evidence. In this regard, the Court finds there was "relevant evidence [that] a reasonable mind might accept as adequate to support [the] conclusion[ ]" of the ALJ. *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir.2010) (internal quotation marks and citation omitted).

ALJ Raynor properly used substantial evidence when assessing the RFC. The RFC is understood as the most that a person can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999).

When the ALJ makes an assessment as to RFC, he should "consider a claimant's physical abilities, mental abilities, symptomatology, including pain, and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). An RFC finding will be upheld on review when there is substantial evidence in the record to support the requirements listed in the regulations." *Desmond v. Astrue*, 11–CV–0818, (VEB), 2012 WL 6648625, at *5, 2012 U.S. Dist. LEXIS 179805, at *14 (N.D.N.Y Dec. 20, 2012).

As noted above, ALJ Raynor concluded that the Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567:

> (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567. ALJ Raynor found that the Plaintiff could perform light work, in that she was able to sit, stand and walk eight hours in an eight-hour day and lift or carry up to twenty pounds at a time.

ALJ Raynor partly based his decision upon the opinion of orthopedist Dr. Kerness, who conducted a consultative examination of the Plaintiff, and the Plaintiff's treating pulmonologist Dr. Karp. Dr. Kerness concluded that the Plaintiff did not have any disability, while Dr. Karp found that the Plaintiff had no limitations on standing or walking and could sit for six hours without interruption. ALJ Raynor also placed consideration on the fact that the Plaintiff could shop; travel without a companion for assistance; climb stairs; prepare a simple meal and feed herself; care for her personal hygiene; and take care of her young daughter. In her testimony, the Plaintiff admitted to being able to do all of these activities.

In addition, Dr. Karp found that none of the Plaintiff's conditions were disabling. Also, Dr. Kerness reported that the Plaintiff had reached maximal improvement; no longer required orthopedic treatment; and could work without restrictions. Similarly, Dr. Katz determined that the Plaintiff's lumbosacral strain was resolved and that

she did not require either physical therapy or orthopedic care. Further, based on a consultative exam of the Plaintiff, Dr. Sulaiman believed the Plaintiff's exertional capacity was "more than moderate exertion." (AR at 619.)

The Court finds ALJ Raynor properly relied upon these critical assessments by Dr. Kerness, Dr. Katz, Dr. Karp and Dr. Sulaiman in determining the Plaintiff's RFC, even though all but Dr. Karp were consulting physicians. *See Cichocki v. Astrue,* 11–CV–755S, 2012 WL 3096428, at *6, 2012 U.S. Dist. LEXIS 106023, at *19 (W.D.N.Y. June 30, 2012) ("It is well settled that an ALJ is entitled to rely upon the opinions of consultative examiners, and such written reports can constitute substantial evidence."); *Ghio v. Astrue,* Civil Action No. 2:10–CV–62, 2011 WL 923419, at *19, 2011 U.S. Dist. LEXIS 22138, at *55–56 (D.Vt. March 1, 2011) ("The ALJ was entitled to rely on the consultative examiners' assessment, in light of the objective medical evidence and his credibility finding."). In this regard, the Court finds that the opinions of Dr. Kerness, Dr. Katz and Dr. Sulaiman all comported with the evidence in the record, including the evaluation of a treating physician, Dr. Karp; the Plaintiff's testimony as to her limitations; and the report of the CDI Unit's concerning its surveillance of the Plaintiff.

The Plaintiff contends that the ALJ ignored medical evidence and did not afford the appropriate weight and consideration to Dr. Haddad, since he was one of the Plaintiff's treating physicians. The Plaintiff also asserts that ALJ Raynor mischaracterized the other physicians as treating physicians. However, in the Court's view, the Plaintiff's contentions are without merit.

As discussed above, "the ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the Treating Physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician." *Moore v. Astrue,* 07–cv–5207(NGG), 2009 WL 2581718, at *10 n. 22, 2009 U.S. Dist. LEXIS 81449, at *33 n. 22 (E.D.N.Y. Aug. 21, 2009). Indeed, "[t]he Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" *Harris v. Astrue,* 07–CV–4554 (NGG), 2009 WL 2386039, at *14, 2009 U.S. Dist. LEXIS 67009, at *40 (E.D.N.Y. July 31, 2009) (quoting *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir.1990)).

Nevertheless, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004) (citations omitted). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* In addition, "the regulations also specify that the Commissioner will always give good reasons in [his] notice of determination or decision for the weight

[he] gives claimant's treating source's opinion." *Id.* (citations and internal quotation marks and alterations omitted).

Despite the Plaintiff's arguments, the Court finds that the ALJ did not err in giving little weight to Dr. Haddad's opinions. "As an initial matter, [Dr. Haddad's] assessments of [the Plaintiff's] 'disability status' [was] not determinative because it is the responsibility of the Commissioner to make the ultimate decision as to whether the claimant has a 'disability' under the statute." *Micheli v. Astrue,* 501 Fed. Appx. 26 (2d Cir.2012); *see also Roma v. Astrue,* 468 Fed.Appx. 16, 18 (2d Cir.2012) (". . . Dr. Prywes's assertion that Roma 'is permanently disabled,' cannot itself be determinative because it is the responsibility of the Commissioner to make the ultimate decision as to whether the claimant meets the statutory definition of 'disabled.' ") (citations omitted).

Furthermore, the Plaintiff ignores the fact that the opinion of Dr. Haddad conflicts with the findings of Dr. Karp, a pulmonologist who was the Plaintiff's other treating physician. Specifically, Dr. Karp opined that the Plaintiff had no limitation on sitting, standing, or walking. In this regard, Dr. Karp's findings appear to be consistent with those of Dr. Kerness, Dr. Katz, and Dr. Sulaiman. Therefore, as ALJ Raynor explained, it was appropriate to give less weight to Dr. Haddad's opinion, since "Dr. Haddad's opinion [was] not consistent with other opinions contained in the record or with the substantial evidence of record." (AR at 17.) *See, e.g., Netter v. Astrue,* 272 Fed.Appx. 54, 56 (2d Cir.2008) ("Where, as here, a treating specialist and state-employed physicians are in agreement that an individual is not disabled, and where this conclusion is supported by record evidence, the Commissioner may reject the contrary opinion of one treating physician.").

Ultimately, as indicated above, the determination of whether a claimant is disabled is "reserved to the Commissioner." 20 C.F.R. § 404.1527(e). As such, the Court finds that ALJ Raynor's determination of the RFC of the Plaintiff—specifically, that the Plaintiff could perform light work—was supported by substantial evidence.

### E. The ALJ's Assessment of the Plaintiff's Credibility

As part of his final determination, ALJ Raynor found that "the claimant is able to perform a full range of activities of daily living, including some cleaning, shopping, taking care of her daughter, preparing meals and taking care of her dog. All of the above is inconsistent with the claimant's allegations of disability." (AR at 20.) The Plaintiff asserts that this statement is a mischaracterization of her testimony, in that she does all of these activities, in large part, with the assistance of her mother and that her mother usually cares for the Plaintiff's daughter and does the cleaning.

Here, even though the Plaintiff testified regarding the extent of her impairments, she also testified to being able to perform a wide-range of daily activities, even if it is often with the assistance of her mother. The Plaintiff also made at least two trips to and from New York to North Carolina via train and car. Moreover, the report of the CDI Unit demonstrated that the Plaintiff was able to move around her front yard and get in and out of her car without apparent difficulty and with a normal gait and pace. In a similar fashion, evaluations from several doctors who examined the Plaintiff stated that she did not appear to experience any apparent distress.

As such, viewing the opinions of a number of physicians that the Plaintiff was able to work, it was reasonable for ALJ

Raynor to discredit the Plaintiff's subjective claim of total disability from all types of work. *See Genier v. Astrue,* 606 F.3d 46, 50 (2d Cir.2010) (finding that when an ALJ assesses a Social Security claimant's credibility, "the ALJ was required to consider all of the evidence of record, including [the claimant's] testimony and other statements with respect to his daily activities") (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)). Furthermore, although the Plaintiff asserts that she had difficulty with performing some of these activities, "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Prince v. Astrue,* 490 Fed.Appx. 399, 400 (2d Cir.2013) (quoting *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir. 1983)). In addition, while the Plaintiff suggests that ALJ Raynor mischaracterized her testimony by stating that her daily activities included cooking, cleaning and doing laundry, the Plaintiff fails to acknowledge. that the ALJ's finding was supported by the record, such as by Dr. Karp's assessment that the Plaintiff did not have any limitation with respect to her sitting, walking, and standing.

Accordingly, the Court finds that ALJ Raynor's decision that the Plaintiff was still capable of performing light work as defined in 20 C.F.R. § 404.1567, and was, therefore, not disabled within the meaning of the Act, was supported by substantial evidence in the record.

## III. CONCLUSION

For the reasons set forth above, it is hereby ordered that the Commissioner's motion for judgment on the pleadings is granted and the Plaintiff's complaint is dismissed. The Clerk of the Court is directed to close this case.

**SO ORDERED.**