Terra M. BARRETT, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner of the Social Security Administration, Defendant.

1:15-CV-00498 EAW

United States District Court, W.D. New York.

Signed September 30, 2016

Lewis L. Schwartz, Lewis L. Schwartz, PLLC, Buffalo, NY, for Plaintiff.

David Brent Myers, Social Security Administration, New York, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

### I. Introduction

Represented by counsel, Plaintiff Terra M. Barrett ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying

Plaintiff's application for Disability Insurance Benefits ("DIB"). (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. 4; Dkt. 7). For the reasons set forth below, the Commissioner's motion is denied, Plaintiff's motion is granted in part, and this matter is remanded for further administrative proceedings.

## II. Factual Background and Procedural History

### A. Overview

On November 18, 2011, Plaintiff filed an application for DIB (Administrative Transcript ("Tr.") at 177-83). In her application, Plaintiff alleged that she had been disabled since April 1, 2010, due to back, neck, shoulder, and hip pain, and arthritis in the upper back, (Tr. 177, 196). Plaintiff's application was initially denied on February 13, 2012. (Tr. 84-87). Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 88-89). Plaintiff, attended by counsel, appeared at a hearing before ALJ Bruce R. Mazzarella on September 12, 2013. (Tr. 21-76). Vocational Expert ("VE") Jay Steinbrenner testified at the hearing, as did Plaintiff's mother, Pamela Brocke. (Id.). On January 30, 2014, ALJ Mazzarella issued a decision finding Plaintiff not disabled. (Tr. 10-20). The Appeals Council denied Plaintiff's request for review on April 7, 2015, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4). Plaintiff commenced this action on June 8, 2015. (Dkt. 1).

### B. The Non-Medical Evidence
#### 1. Plaintiff's Testimony

Plaintiff was 33 years old on the day that the ALJ rendered his decision. (See Tr. 20). At the hearing, Plaintiff testified that she was living in an apartment with her boyfriend and 11-year-old daughter. (Tr. 26-28). Plaintiff was 4' 11' tall and weighed 175 pounds. (Tr. 27). Plaintiff stated that she could drive a car, but was restricted to driving a maximum of 20 minutes at a time because she could not sit for more than 30 minutes. (Tr. 29).

The ALJ questioned Plaintiff about her past work experience. (Tr. 30-31). Plaintiff testified that she had previously worked at a car wash, and as a telemarketer, an assistant teacher at a daycare center, a cashier, a fast food worker, and as a secretary. (Id.). Plaintiff's last period of employment—as a secretary—ended in April of 2010 due to Plaintiff being laid off. (Tr. 31). Plaintiff collected New York State Unemployment Insurance Benefits for 99 weeks thereafter. (Id.). During that time, Plaintiff participated in a workshare program and attended classes at SUNY Buffalo State College. (Id.).

Plaintiff testified that she had a work-related injury to her neck and upper back in 2006 for which she was receiving Worker's Compensation Benefits, including cash payments and medical coverage. (Tr. 31-37). Plaintiff met with vocational rehabilitation specialists in 2008, as required by Worker's Compensation, before she started work as a secretary. (Tr. 32-33). Plaintiff was rated 50% disabled by Worker's Compensation. (Tr. 32).

Plaintiff also reported that she had been in an automobile accident in June of 20 11. (Tr. 33). She received medical and lost wage benefits following the accident, but had exceeded the coverage provided at the time of the hearing. (Id.). Plaintiff stated that she had a pending lawsuit relating to the accident. (Tr. 33-35).

Plaintiff testified that she had completed an associate's degree in social science and human services, and started working on her bachelor's degree after she was laid

off. (Tr. 37-39). Plaintiff stated that she stopped taking classes because she was unable to attend two-hour seminars or complete classwork due to her pain. (Tr. 39).

The ALJ questioned Plaintiff about her alleged disabling problems. Plaintiff first stated that her "biggest problem" was with her lumbar spine and right hip, injuries that occurred because of the 2011 car accident. (Tr. 39-40).

Plaintiff's back hurt "all the time," and the pain worsened with activities like dressing, showering, and negotiating stairs. (Tr. 41-42). Plaintiff reported a baseline pain level of 6/10, and 9/10 or 10/10 when she did aggravating activities. (Tr. 42; 45-46). Plaintiff testified that she had been prescribed Lortab for neck pain, but the medicine helped with back and hip pain as well. (Tr. 43-44). She took Motrin 800 for her back pain. (Tr. 44). Plaintiff had been given injections for her hip. (Tr. 46). She also testified that she occasionally wore a back brace prescribed by her chiropractor. (Tr. 45). Plaintiff had not had surgery on her back or hip, and had not attended physical therapy for those issues. (Tr. 46-47).

The ALJ next asked Plaintiff about her neck and upper back pain, which resulted from her Worker's Compensation injury. (Tr. 47). Plaintiff had not had any surgery on the area, but did use a TENS Unit. (Tr. 48-49). The TENS Unit helped with her pain. (Tr. 49). She took Lortab and Flexril for her neck pain. (Tr. 47-48). She also reported a prescription for associated tension headaches. (Tr. 48). Plaintiff had not seen any specialists for her headaches. (*Id.*).

Plaintiff also mentioned that she was prescribed Lyrica for "numbness and the tingling in the hands . . . ." (Tr. 49). The hand problems seem to have arisen from the car accident, but the specific cause was unresolved. (*See* Tr. 50).

Plaintiff further testified about a shoulder injury. (Tr. 57-58). Plaintiff stated she could lift her arm over her head, but could not put it behind her head. (*Id.*). Plaintiff reported "significant improvement" following surgery on the shoulder. (Tr. 58).

Plaintiff noted that she did not sleep well, and that she suffered from Irritable Bowel Syndrome. (Tr. 58-60). She had not seen a specialist for the Irritable Bowel Syndrome. (Tr. 60).

The ALJ also asked Plaintiff about her daily activities. Plaintiff testified that she spent her time watching television, talking with her daughter, visiting neighbors, and fishing in a nearby creek. (Tr. 51-54). Brocke, Plaintiff's mother, helped with cooking, shopping, and cleaning. (Tr. 51-52). Brocke also helped Plaintiff clean and brush her hair. (Tr. 52). Plaintiff brought her daughter to volleyball and cheerleading practices and socialized with other parents during the practices. (*Id.*).

ALJ Mazzarella then questioned Plaintiff about her work-related restrictions. (Tr. 54-56). Plaintiff stated that she could sit for about 20 minutes at a time, for a maxi mum of two hours in an eight-hour workday. (Tr. 54-55). Plaintiff could stand for 45 minutes at a time, for a maximum of five hours in an eight-hour workday. (Tr. 55). Plaintiff also testified that she could only stand and/or sit for about two hours before she needed to recline for two hours or more. (*Id.*). Plaintiff said she could walk about one block at a time and could not lift more than ten pounds. (Tr. 55-56).

### 2. Plaintiff's Mother's Testimony

Brocke also testified during the hearing. (Tr. 61-67). Brocke stated that she helped Plaintiff with daily chores including laundry, cleaning, and vacuuming. (Tr. 63). Brocke said that she went grocery shop-

ping with Plaintiff, but that Plaintiff did not use an electronic cart at the store every time. (Tr. 63-64). Brocke reported that Plaintiff tried to do things for herself. (Tr. 64). Brocke noted that Plaintiff's pain was worsening, evidenced by Plaintiff's inability to tie her own shoes and wash her own hair. (Tr. 64-66).

### 3. Vocational Expert's Testimony

VE Steinbrenner also testified at the hearing. (*See* Tr. 67-75). Steinbrenner reported Plaintiff's past work history and the associated skill and exertional levels for each job. Steinbrenner described Plaintiff's past work as: a secretary (skilled, sedentary work); an order selector or order filler (semi-skilled, light work); a fast food worker (unskilled, light work); a deli clerk (unskilled, light work); a daycare worker (semiskilled, light work); and a telemarketer (semi-skilled, sedentary work). (Tr. 70-71). VE Steinbrenner did not address Plaintiff's work as a car wash attendant because that work was only part-time. (Tr. 70).

The ALJ then posed hypotheticals to the VE. (Tr. 71-75). In the first hypothetical, the ALJ asked if there was work for a person with Plaintiff's background and experience

> who could sit for 15 to 20 minutes at a time, but only an hour-and-a-half to two hours in an eight-hour workday, stand 45 minutes in an eight-hour workday, but [was] only able to alternate sitting and standing for one-and-a-half to two hours without having to lie down or recline for two hours. Walk [sic] a block, lift under ten pounds, probably under three pounds.

(Tr. 71). The VE stated that such a person could not work in Plaintiff's past positions, and there would not be work for such a person in the national economy because the need to recline would take that person

off task too much to meet work requirements. (Tr. 71-72).

The ALJ then posed a second hypothetical, which involved a person

> [w]ith the vocational profile of [Plaintiff], who could sit for an eight-hour workday with only normal breaks and meal periods. Stand and/or walk for an eight-hour workday, with only normal breaks and meal periods, lift and carry 20 pounds occasionally, 10 pounds frequently ... [could] only occasionally stoop, crouch, kneel, and climb stairs ... [and] should not engage in frequent repetitive reaching above the shoulder level, nor frequently engage in repetitive twisting of the spine.

(Tr. 72). The VE testified that such a person would be able to work as a secretary or a daycare worker, but not as an order filler or a deli clerk. (Tr. 72-74). In a final hypothetical, the ALJ asked whether a person with the same limitations as the second hypothetical who had an additional "marked limitation in concentration, persistence and pace on even simple, repetitive and routine tasks" would be able to work in Plaintiff's past jobs. (Tr. 74). VE Steinbrenner testified that such a person may be able to obtain a position with those restrictions, but would eventually be fired because they could not complete the work satisfactorily. (*Id.*).

### C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the voluminous medical evidence in this case. Therefore, only a brief summary is necessary.

### 1. Physiatrist Dr. Andrew Matteliano

Physiatrist Andrew Matteliano, M.D., saw Plaintiff frequently in association with her receipt of Worker's Compensation benefits to address headaches, and cervical, thoracic, and lumbosacral spinal issues. (*See* Tr. 324-55, 1023-24, 1290-96, 1305-08).

Dr. Matteliano noted during his first appointment with Plaintiff on February 18, 2008, that she had tenderness over the cervical spine, reduced neck rotation and extension, trigger points in the back, and mild low back tenderness. (Tr. 356-57). A CT scan and MRI reviewed by Dr. Matteliano showed "a posterior central disc protusion at C5-6." (Tr. 345). Plaintiff noted that she had tingling and numbness in her upper extremities. (*Id.*). On April 15, 2010, Dr. Matteliano found that Plaintiff had "right CVA tenderness," rotational limitations, and limited forward flexion. (Tr. 337). Plaintiff reported that massage therapy helped to maintain her pain levels and increased her flexion. (*Id.*).

Dr. Matteliano provided trigger point injections on Plaintiff's C3-C7 and T1, and multiple points on her back without incident on February 29, 2008, October 28, 2008, March 25, 2009, April 29, 2009, July 22, 2009, January 10, 2010, May 7, 2010, June 4, 2010, August 4, 2010, August, 25, 2010, October 22, 2010, January 12, 2011, and September 23, 2011. (Tr. 325-55). On January 21, 2011, Dr. Matteliano found that Plaintiff's cervical rotation remained about 40 to 50 degrees, and there was tenderness in the lower back. (Tr. 328). On August 2, 2011, Dr. Matteliano noted that Plaintiff was using "Lortab for pain, Flexeril for the muscle spasms[,] and Fioricet ... for headaches." (Tr. 326). Plaintiff exhibited tenderness in the thoraco lumbar junction. (*Id.*).

At a follow up appointment on October 31, 2011, Dr. Matteliano reported that the injections provided "some relief" for Plaintiff's headaches, and opined that, for purposes of Worker's Compensation, Plaintiff had a "moderate to marked partial permanent disability." (Tr. 324). Dr. Matteliano provided the same opinion as recently as May 13, 2013. (Tr. 1291).

## 2. Orthopedic Surgeon Dr. Cameron Huckell

Plaintiff initiated care with Cameron Huckell ("C. Huckell"), M.D., for mid- and lower-back pain on July 15, 2011, stemming from a June 13, 2011 car accident. (Tr. 464). Plaintiff reported mid back pain averaging 5/10, with maximum pain of 7/10. (Tr. 465). She also reported average and maximum lower back pain of 10/10, with intermittent numbness in the right leg. (*Id.*). Plaintiff was able to walk but significantly favored the right leg. (Tr. 466). She was unable to stand on her heels or toes. (*Id.*). An x-ray dated July 15, 2011, evidenced a mild anteriorly wedged appearance to the T11 and T12 vertebrae. (*Id.*). X-rays of the right hip were "unremarkable," but because of her gait, Dr. C. Huckell suggested getting an MRI. (Tr. 467). Dr. C. Huckell advised Plaintiff to "continue all conservative care consisting of regular chiropractic manipulations." (*Id.*). On August 4, 2011, Dr. C. Huckell believed that Plaintiff's "symptoms should resolve with time and conservative measures," and noted that she would "not require surgical intervention." (Tr. 1226).

On August 23, 2011, Dr. C. Huckell diagnosed herniated discs of the lumbar and thoracic spine without myelopathy after reviewing MRI scans of Plaintiff's lower back. (Tr. 472). Dr. C. Huckell recommended pain management treatment, "simple physical therapy," stated that surgery was not necessary, and provided Plaintiff a note so that she could walk around during three-hour classroom lectures at school. (*Id.*). Dr. C. Huckell prescribed continued conservative care consisting of chiropractor visits, physical therapy, and pain management in June 2012, January 2013, and July 2013. (Tr. 1245, 1256, 1261, 1312).

### 3. Orthopedic Surgeon Dr. Graham Huckell

Plaintiff saw Graham Huckell ("G. Huckell"), M.D., on July 20, 2011, to address right hip pain resulting from her car accident. (Tr. 832). Plaintiff initially reported sharp pain, rated 8/10, that was worst when sitting or maintaining positions for prolonged periods, and improved with activity modification. (*Id.*). Dr. G. Huckell performed a physical examination and assessed an internal derangement of the right hip, right hip sprain, right hip pain, and low back pain. (Tr. 834). He recommended physical therapy, rest, ice, and avoiding "high impact activities." (Tr. 835).

When Plaintiff returned to Dr. G. Huckell on September 9, 2011, she reported "some improvement" in her right hip, but continued to complain of right groin and low back pain. (Tr. 837). Physical therapy yielded improvement. (*Id.*). Dr. G. Huckell noted that Plaintiff's MRI showed "a capsular thickening and slight increased signal lateral distal right hip joint capsule probably due to sprain with no complete tear seen." (Tr. 839). Dr. G. Huckell's assessment was unchanged and he recommended that Plaintiff continue physical therapy, rest, ice, and anti-inflammatory medications on an as-needed basis. (*Id.*).

On October 7, 2011, Dr. G. Huckell stated that Plaintiff "continue[d] to note improvement in her right hip," but still experienced pain in the right hip, groin, medial thigh, and right buttocks. (Tr. 851). Dr. G. Huckell added right hip greater trochanter bursitis to his prior assessment, but informed Plaintiff that he had no further treatment to offer her, and recommended that she consider nonsurgical pain management treatment. (Tr. 853-54).

On January 3, 2013, Plaintiff returned to Dr. G. Huckell complaining of pain in her right hip that she rated as 3/10. (Tr. 1263). Dr. G. Huckell noted the possibility of a labral tear, ordered an MRI, and recommended that Plaintiff continue to rest and ice her hip, modify her activities as needed, and participate in physical therapy. (Tr. 1265-66). Two weeks later, Plaintiff reported pain of 6/10. (Tr. 1268). An x-ray revealed a normal pelvis and right hip. (Tr. 1270). An MRI revealed that the edema (swelling) seen on the July 2011 scan was no longer present, "consistent with a healed sprain," and there was no rupture of the capsule, occult fracture, or avascular necrosis, and the sole finding was mild glutenus medius tendinopathy. (Tr. 1270-71). There was also no labral tear. (Tr. 1271). Dr. G. Huckell assessed internal derangement of the right hip, right hip sprain, and right hip pain. (*Id.*).

### 4. Orthopedic Surgeon Dr. A. Marc Tetro

Plaintiff initiated treatment with orthopedic surgeon Dr. A. Marc Tetro for a right shoulder and arm injury on July 27, 2011. (Tr. 995). X-rays were "essentially within normal limits," and Dr. Tetro administered an ultrasound-guided right shoulder subacromial injection to address pain aggravated by reaching, lifting, gripping, and grasping. (Tr. 997-98). The injection afforded her "significant improvement in her shoulder and arm symptoms with some persistent symptoms at her armpit." (Tr. 998). Dr. Tetro diagnosed Plaintiff with right shoulder impingement syndrome, right shoulder post-traumatic AC joint arthrosis, and cervical origin of pain. (Tr. 826). Dr. Tetro opined that Plaintiff was disabled and unable to work. (Tr. 827).

Plaintiff returned on September 7, 2011, reporting "significant right shoulder symptoms" but noting that the prior corticosteroid injection gave her "significant temporary relief of her pain." (Tr. 1000). Dr. Tetro diagnosed rotator cuff tendonitis, which left Plaintiff "unable to work" at the

time, and recommended physical therapy. (Tr. 1002). After follow up visits in September, October, and December 2011 (Tr. 1000-11), Dr. Tetro recommended surgical intervention in February 2012 (Tr. 1015).

On March 8, 2012, Dr. Tetro performed right shoulder arthroscopic subacromial decompression and distal clavicle excision surgery, without complication. (Tr. 980-82). On March 21, 2012, Dr. Tetro reported that Plaintiff was "doing well following surgery" and was not taking pain medication. (Tr. 983). He referred Plaintiff for physical therapy. (Tr. 1074-75).

On May 5, 2012, Dr. Tetro reported that Plaintiff continued to experience significant improvement following surgery, and that "[s]he is very pleased with her surgical results thus far." (Tr. 987). Dr. Tetro opined that Plaintiff was "excellent following surgical intervention," and no longer had any disability regarding her right shoulder. (Tr. 989). He reiterated this opinion in July 2012. (Tr. 993).

### 5. Physician Dr. Bernard Beaupin

Plaintiff saw Bernard Beaupin, M.D., from September 2011 to March 2013. (Tr. 477, 482, 751-74, 1090-1101). Dr. Beaupin initially recommended physical therapy for her right hip and chiropractic treatment for her lumbar spine. (Tr. 477). On November 22, 2011, Plaintiff reported that her right hip had responded well to a steroid injection. (Tr. 482). According to Dr. Beaupin, a "majority" of Plaintiff's pain came from a hip adductor group strain or sprain. (Id.). Dr. Beaupin assessed that Plaintiff's lumbar pain was "likely secondary to the bulging disc and sprain/strain." (Id.).

On October 19, 2012, Dr. Beaupin noted that Plaintiff "responded very well" to right hip bursa and iliolumbar ligament steroid injections, and prescribed further physical therapy. (Tr. 1100). On January 18, 2013, Dr. Beaupin stated that Plaintiff completed her course of physical therapy but still had "some pain and subjective weakness." (Tr. 1274). Dr. Beaupin recommended a fluoroscopically-guided right hip steroid injection, which was performed on February 15, 2013. (Tr. 1277, 1288-89).

Plaintiff reported "good relief of her pain right after the injection," but that the pain returned the next day. (Tr. 1279). Dr. Beaupin concluded that "[t]his effectively rules out the hip joint itself as a source of her pain," and prescribed Lidoderm patches in the region. (Tr. 1282). Dr. Beaupin declined to order an L5-S1 discogram because Plaintiff was unwilling to pursue surgery. (Id.).

Plaintiff returned on March 19, 2013, reporting "substantially increased" pain. (Tr. 1283). Plaintiff believed that her hip injection "may have been more effective [than] she [initially] thought," and Dr. Beaupin noted that Plaintiff "did not have any popping sensations in the hip after the intra-articular injection." (Id.).

### 6. Orthopedic Surgeon Dr. Christopher Hamill

Plaintiff saw orthopedic surgeon Christopher Hamill, M.D., twice, for mid- and lower-back pain resulting from the car accident. (Tr. 1314-18). A July 15, 2013, x-ray demonstrated no evidence of a scoliotic curve, and revealed well-maintained disc space heights throughout the thoracic and lumbar spine. (Tr. 1315). Plaintiff displayed normal gait. (Id.). Dr. Hamill ordered an updated MRI of Plaintiff's lumbar spine, the results of which he characterized as "essentially unremarkable" and showing no evidence of disc herniation or spinal stenosis. (Tr. 1318). Dr. Hamill reported on August 22, 2013, that he could not do anything for Plaintiff because he "[did] not think her leg pain is coming from her back since the discs are not compressing on any nerves." (Id.).

## 7. Chiropractic Treatment

Plaintiff received frequent chiropractic treatment from Peter Guzinski, D.C., for neck and middle back issues from January 2006 through November 2012. (*See* Tr. 486-704, 929-75, 1188-1217). According to Dr. Guzinski, regular treatment through April 14, 2011—shortly before Plaintiff's car accident—provided Plaintiff "enough benefit ... to function as a single parent and to go to school." (Tr. 704).

Treatment following the car accident addressed injuries sustained in the accident. (*See* Tr. 486-519). On November 2, 2012, Plaintiff was still symptomatic but was tolerating her treatment well and making "slow improvement" with chiropractic treatment. (Tr. 1216-17). Specifically, her lumbar range of motion was improved, she was able to walk longer distances with less pain, her sensation in the C5 dermatome was improved, and she felt like she was getting slightly stronger. (Tr. 1216). Dr. Guzinski recommended decreasing Plaintiff's visit frequency, and that Plaintiff "stay completely out of work." (Tr. 1217).

## 8. Other Diagnostic Medical Imaging

An MRI of Plaintiff's cervical spine on January 14, 2008 showed a posterior disc protrusion/herniation at C4-5 and C5-6 without deformity to the spinal cord or appreciable foraminal narrowing. (Tr. 363). An MRI of the thoracic spine the same day showed a mild disc bulge at the T11-12. (Tr. 364). The rest of the levels in the thoracic spine were normal. (*Id.*).

A CT scan of Plaintiff's cervical spine performed on June 13, 2011, following the car accident, revealed no evidence of acute fracture or subluxation of the cervical spine, but there was a straightening of the normal cervical lordosis. (Tr. 308). X-rays of her lumbar spine and pelvis performed the same day were negative. (Tr. 309-10). Transvaginal pelvic and renal ultrasounds performed on June 23, 2011, were both unremarkable. (Tr. 815-16).

An MRI of Plaintiff's right hip performed on July 15, 2011, revealed capsular thickening and slight increased signal intensity of the lateral distal right hip joint capsule, "probably due to sprain." (Tr. 819). The scan did not reveal a complete tear, and trace hip joint fluid was within normal limits. The radiologist assessed an "otherwise, unremarkable MRI examination of the right hip. No occult fracture or labral tear is seen." (*Id.*).

An MRI of Plaintiff's thoracic spine performed on July 19, 2011, revealed anterior longitudinal ligament thickening and squared appearance of the vertebral bodies suggestive of ankylosing spondylitis at the T4-5 through T10 levels, and an anterior Schmorl's node at the T12 superior endplate, and mild T-11-12 anterior spurring. (Tr. 312). An MRI of her lumbar spine performed the same day revealed a disc bulge at the L5-S1 level that attenuated epidural fat but did not extend to or affect the thecal sac. (Tr. 313).

An MRI of Plaintiff's cervical spine performed on February 16, 2012, revealed mild C5-C6 central stenosis from encroachment by a prominent central protrusion that impresses on the ventral cord; C4-C5 relative central stenosis from encroachment by a disc protrusion that affects the thecal sac and subjacent cerebrospinal fluid (CSF); and C6-C7 encroachment by a subtle right paracentral protrusion that straightens the thecal sac's right ventral margin. (Tr. 978).

An MRI of Plaintiff's thoracic spine performed the same day revealed a minimal developmental wedge configuration of the T11 and T12 vertebral bodies and anterior spurring at T10-T11 and T11-T12; T10-T11 ligamentum flavum thickening that is greater on the right where mild impression on the posterolateral thecal sac is

present; and T11-T12 impression on the ventral sac by a disc bulge. (Tr. 979).

### D. Treating Provider Statements

Plaintiff provided a number of treating provider opinion statements to the Social Security Administration. Following the car accident, Dr. Guzinski provided a number of "work excuse" notes recommending that Plaintiff "stay completely out of work." (Tr. 1072-73, 1106, 1112, 1115, 1117). These opinions were also included in Dr. Guzinski's voluminous treatment notes. (Tr. 487, 494, 885, 892, 968, 971, 1217). In September 2011, Dr. Guzinski opined that Plaintiff should avoid prolonged sitting or standing greater than 30 minutes, lifting greater than 10 pounds or above the shoulder, and repetitive bending, pushing, pulling, or reaching. (Tr. 1104).

Throughout the course of his treatment of Plaintiff, Dr. Beaupin completed numerous "disability certificates" which indicated that, in his opinion, Plaintiff was "temporarily disabled." (Tr. 1107-11, 1113-14, 1116, 1118).

Dr. Matteliano consistently assessed a "moderate to marked partial permanent disability" for Worker's Compensation purposes. (Tr. 324-38, 1023-24, 1291-97, 1306-08). Twice in February 2012, Dr. C. Huckell assessed "a partial disability to a mild to moderate degree (37.5%)" with no work restrictions. (Tr. 1245, 1250). Dr. C. Huckell opined on April 30, 2012, that

> [Plaintiff] should avoid excessive bending, stooping, reaching, twisting, crawling or climbing. [Plaintiff] should not lift anything greater than 20 pounds. [Plaintiff] should avoid sitting, standing or walking for more than 2 hours at one time without a break and the total work day should not exceed 8 hours.

(Tr. 1240). Dr. C. Huckell provided the same opinion on July 9, 2013. (*See* Tr. 1312).

On both May 2, 2012 and July 13, 2012—after Plaintiff's shoulder surgery—Dr. Tetro opined that Plaintiff had no disability of her right shoulder. (Tr. 989, 993).

### E. State Agency Opinions

Orthopedist Melvin Brothman, M.D., evaluated Plaintiff on July 14, 2010, to assess her condition related to the 2006 workplace injury. (Tr. 394). Dr. Brothman completed a physical examination and review of Plaintiff's medical file. (Tr. 394-95). He diagnosed "questionable cervical disc disease" and "right sided radiculopathy[,] stable." (Tr. 395). Dr. Brothman thought that pain management treatment was reasonable. (*Id.*). He did not feel that further trigger point injections were necessary, and concluded that further chiropractic care (which had already been ongoing for four years) would be of no benefit. (Tr. 395-96).

Dr. Brothman reexamined Plaintiff on September 13, 2010. (Tr. 387). Dr. Brothman assessed a cervical strain/sprain, and myofascial dysfunction of the cervical spine and scapular with no clinical evidence of disc disease. (Tr. 389). Based on these findings, Dr. Brothman opined that Plaintiff's disability was "mild to moderate in degree" and that she could "return to work as of this time with restrictions of avoiding looking upward, turning her head, reaching overhead, or lifting over 20 to 25 pounds." (*Id.*).

On February 7, 2012, Plaintiff attended an internal medicine consultative examination with Samuel Balderman, M.D., in association with her claim for Social Security benefits. (Tr. 717). Plaintiff complained of pain in her neck, shoulder, and lumbar spine, for which medication was helpful. (*Id.*). Plaintiff reported that she was able to bathe and dress herself slowly. (Tr. 718). Dr. Balderman observed that Plain-

tiff was in no acute distress, exhibited a normal gait and stance, and could walk on her heels and toes without difficulty. (*Id.*). She used no assistive devices, could squat 50 percent of full, and needed no help changing for the exam or getting on and off the exam table. (*Id.*). She was able to rise from a chair without difficulty. (*Id.*). She retained the full range of motion of her cervical spine with mild pain, lumbar flexion to 70 degrees, and full extension, lateral flexion, and rotary movements. (Tr. 719). Straight leg raise testing was negative bilaterally. (*Id.*). Plaintiff could elevate her right shoulder to 100 degrees, her rotary movement was decreased by 50 percent, and she could elevate her left shoulder to 120 degrees. (*Id.*). She retained the full range of motion of her elbows, forearms, wrists, hips, knees, and ankles, as well as full hand and finger dexterity and grip strength. (*Id.*).

Dr. Balderman diagnosed right shoulder pain and somatosensory disorder, stable. (*Id.*). Vocationally, Dr. Balderman assessed a "mild-to-moderate limitation in reaching, pushing, and pulling due to right shoulder pain." (*Id.*).

**F. Other Source Opinions**

Chiropractor Gregory Hnat, D.C., evaluated Plaintiff on July 9, 2010 for Worker's Compensation purposes. (Tr. 397). Dr. Hnat reviewed Plaintiff's medical history and conducted a physical examination. (Tr. 397-99). Dr. Hnat diagnosed a resolved "cervical spine sprain/strain, resolved" and opined that Plaintiff's condition did not warrant further chiropractic care or massage therapy, and that she did not need household assistance, diagnostic testing, durable medical equipment, or special transportation. (Tr. 399). Dr. Hnat re-examined Plaintiff on August 27, 2010, diagnosed a resolved cervical spine strain/sprain, and found "no evidence of disabili-

ty." (Tr. 300). Dr. Hnat opined that Plaintiff was "capable of working and performing all of her usual activities of daily living without restriction." (*Id.*).

**III. The Commissioner's Decision Regarding Disability**

**A. Determining Disability Under the Social Security Act**

█ For both Social Security Insurance and Disability Insurance Benefits, the Social Security Act provides that a claimant will be deemed disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination of disability at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The five steps are as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

**B. Summary of the ALJ's Decision**

In applying the five-step sequential evaluation in this matter, ALJ Mazzarella made the following determinations. First, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 12). At step one of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 1, 2010, but that she collected New York State Unemployment Benefits after that date. (*Id.*).

At step two, the ALJ found that Plaintiff suffered from severe impairments, including: "chronic neck pain; chronic back pain; right shoulder pain, statuts post arthroscopic surgery; [and] right hip pain." (*Id.*).

At step three, the ALJ found that none of Plaintiff's severe impairments, alone or in combination, qualified as an impairment listed in Appendix 1. (Tr. 12-13).

Because Plaintiff's severe impairments failed to meet the standards of a listing under Appendix 1, ALJ Mazzarella assessed Plaintiff's Residual Functional Capacity ("RFC") in step four of the sequential analysis. (Tr. 13-19). The ALJ found that Plaintiff:

> [H]as the [RFC] to perform light work ... except she is able to sit, stand and walk for an eight-hour workday with normal breaks and meal periods. She can lift and carry 20 pounds occasionally and 10 pounds frequently, and she can occasionally stoop, crouch and climb stairs, but she should not perform repetitive reaching above shoulder level. She should not perform repetitive twisting of the spine.

(Tr. 13). In making his RFC determination, the ALJ followed a two-step process. First, the ALJ "determined whether there is an underlying medically determinable physical or mental impairment... that could reasonably be expected to produce [Plaintiff's] pain or other symptoms." (*Id.*). Then the ALJ assessed the intensity, persistence, and limiting effects of Plaintiff's symptoms, and made findings of credibility "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not sub-

stantiated by objective medical evidence ...." (Tr. 14).

At RFC step one, ALJ Mazzarella found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms ...." (*Id.*). However, at RFC step two, he found that the statements regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms were not credible. (*Id.*).

ALJ Mazzarella first noted that Plaintiff's symptoms "sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone ... " (*Id.*). The ALJ considered Plaintiff's daily activities, the location duration frequency and intensity of the symptoms, precipitating and aggravating factors, the medication taken to relieve symptoms, other treatments received, and measures taken by Plaintiff to relieve symptoms. (Tr. 14); *see* SSR 96-7p; 20 C.F.R. § 404.1529(c)(3).

The ALJ found "[t]he allegation of total disability is not fully credible and is not supported by the medical evidence of record." (Tr. 14). ALJ Mazzarella noted Plaintiff's work-related neck and back injury that occurred on April 13, 2006. (*Id.*). The ALJ reported that Plaintiff had been treated for that injury "conservatively" by a chiropractor and through pain management. (*Id.*).

The ALJ stated that even though Plaintiff alleged a disability onset date of April 1, 2010, "the record shows she stopped working for reasons other than disability ...." (*Id.*). According to the ALJ, Plaintiff stopped working because she was laid off on March 26, 2010. (*Id.*). ALJ Mazzarella asserted that to receive unemployment benefits for 99 weeks from the State of New York, Plaintiff was required "to certify that she was ready, willing and able to work, and [that] she was not disabled." (Tr. 14-15). The ALJ found that the con-

tradiction between such a certification and Plaintiff's claim of disability starting April 1, 2010, had a negative inference on Plaintiff's credibility. (Tr. 15). The ALJ also said that despite Plaintiff's claims that she could not work, the medical evidence supported a finding of only partial disability, and that Plaintiff "retained the ability to engage in sedentary to light work." (*Id.*).

The ALJ did not give significant weight to Brocke's testimony. (Tr. 19). The ALJ found that Brocke had no medical training that suggested she had an ability to make exacting observations as to Plaintiff's symptoms. (Tr. 18). This made the accuracy of Brocke's testimony questionable. (*Id.*). Brocke was an interested third-party witness. (Tr. 19). Most importantly to ALJ Mazzarella, Brocke's testimony did not receive significant weight because it was inconsistent with the "opinions and observations by medical doctors in this case." (*Id.*).

The ALJ also provided an overview of the medical evidence, including the records provided by Drs. Hnat, Brothman, Mattliano, Guzinski, C. Huckell, G. Huckell, Tetro, Beaupin, Balderman, and Hamill. (Tr. 15-19). The ALJ explicitly weighed only the opinions of Drs. C. Huckell, Balderman, and Tetro. The ALJ did not give controlling weight to the December 16, 2011 opinion of Dr. C. Huckell because it was "inconsistent with the results of the clinical examination of the consultative examination of Dr. Balderman." (Tr. 19). Dr. C. Huckell's opinion did not receive "significant" weight because, according to the ALJ, it was inconsistent with Dr. C. Huckell's treatment notes and another opinion he provided. (*Id.*).

The ALJ gave the opinion of Dr. Balderman "significant weight" because it was consistent with objective findings and clinical exams. (*Id.*). The ALJ noted that Dr. Balderman's opinion regarding Plaintiff's

right shoulder was rendered before her shoulder surgery. (*Id.*). Dr. Tetro's opinion of "no disability relating to [Plaintiff's] shoulder" was given significant weight because it was consistent with post-surgical examinations. (*Id.*).

The ALJ concluded that Plaintiff's allegations regarding how long she can sit, stand, walk, lift, and carry were not credible. (*Id.*). The ALJ found that "[a]ll reports are consistent with sedentary work," and the Worker's Compensation's finding of "partial disability" was consistent Plaintiff's restrictions in daily living, but her allegations of total disability were inconsistent with the medical evidence. (*Id.*). "[Plaintiff] failed to show a changed circumstance material to the determination of disability to rebut the presumption of continuing nondisability." (*Id.*).

At step five, the ALJ found that Plaintiff was capable of performing past relevant work as a telemarketer, a secretary, or a daycare worker. (*Id.*). Therefore, the ALJ concluded Plaintiff was not disabled under the Social Security Act from April 1, 2010, until the date of the ALJ's decision. (Tr. 20).

## IV. Discussion

Plaintiff asserts three arguments, each of which—according to Plaintiff—requires this Court to remand the case for further proceedings. First, Plaintiff argues that the ALJ erred in ignoring Dr. Beaupin's medical opinions and improperly weighing Dr. Balderman's opinion. (Dkt. 4-1 at 12-14). Second, Plaintiff asserts that the ALJ erred in failing to weigh Dr. Guzinski's opinions. (*Id.* at 14–17). Finally, Plaintiff claims the ALJ's decision was not supported by substantial evidence because he failed to fully and properly assess Plaintiff's credibility. (*Id.* at 17–22).

## A. Standard of Review

■ This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart,* 431 F.Supp.2d 312, 317 (E.D.N.Y.2006) (quoting 42 U.S.C. § 405(g)). The Social Security Act directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

> Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

*Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

■ The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a ben-

efits case *de novo)*. If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir.1996).

■ Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

### B. The ALJ Erred in Failing to Weigh Treating Provider Opinions

■ An ALJ is required to consider every medical opinion received by the Social Security Administration, and to review all available evidence. 20 C.F.R. § 404.15278(c); *Whipple v. Astrue*, 479 Fed.Appx. 367, 370 (2d Cir.2012). The medical opinion of a treating source is generally entitled to "controlling" weight. 20 C.F.R. § 404.1527(c). "[E]ven when a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir.2015) (citing 20 C.F.R. § 404.1527(c)). An ALJ must weigh certain factors in evaluating both treating and non-treating source statements, including the nature, length, and extent of the treating or examining relationship, as well as whether the medical opinion is supported by, and consistent with, medical signs and laboratory findings. 20 C.F.R. § 404.1527(c). After considering those factors, "the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir.2008). An ALJ "is not permitted to substitute his own expertise or view of the medical proof... for any competent medical opinion." *Greek v. Colvin*, 802 F.3d at 375.

■ Remand is required when an ALJ fails to adequately evaluate the weight of a medical opinion in light of the factors set forth in 20 C.F.R. § 404.1527(c). *See, e.g., Evans v. Colvin*, 649 Fed.Appx. 35, 39, 2016 WL 2909358, at *3 (2d Cir.2016); *Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir.2015). "Such an error ... requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir.2010); *see, e.g., Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

The ALJ's discussion of the medical opinion evidence provided explicit weights for only three medical opinions—those from Drs. C. Huckell, Balderman, and Tetro. (Tr. 19). ALJ Mazzarella discussed Dr. Beaupin's medical treatment notes, but did not discuss Dr. Beaupin's disability certificate opinions, and did not describe the weight that he gave to those opinions. (Tr. 17).

■ Dr. Beaupin treated Plaintiff consistently from September 2011 until March 2013. As such, under Social Security regulations Dr. Beaupin's medical opinions were generally entitled to "controlling weight." If controlling weight was not given to Dr. Beaupin's medical opinions, the ALJ was required to provide an explanation as to why that was the case. Dr. Beaupin's disability certificates were perfunctory and included no in-depth analysis of Plaintiff's limitations. This may have been the reason that they were not provided controlling weight. However, it is not the role of this Court to weigh the evidence; that is the exclusive province of the

Commissioner. The ALJ's failure to mention Dr. Beaupin's opinions in his Decision constitutes legal error. *See Lesterhuis*, 805 F.3d at 88; *Johnson*, 817 F.2d at 986.

 Similarly, ALJ Mazzarella failed to explicitly weigh Dr. Guzinski's opinions. Dr. Guzinski, as a chiropractor, is not an "acceptable medical source" under the Social Security regulations. *See* 20 C.F.R. § 404.1513(d)(1). Information from "other sources," like a chiropractor, "cannot establish the existence of a medically determinable impairment . . . [but] may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03P. Dr. Guzinski's opinions are not entitled to controlling weight like those of a treating physician, but must still be evaluated by the ALJ. *See id.* ("Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."); *see, e.g., Monette v. Astrue*, 269 Fed.Appx. 109, 113 (2d Cir.2008) (recognizing that an ALJ has discretion to afford significant weight to a chiropractor's opinion).

ALJ Mazzarella failed to weigh any of Dr. Guzinski's opinions regarding Plaintiff's disability. Dr. Guzinski's status as an "other source" does not obviate the ALJ's responsibility to analyze Dr. Guzinski's opinions. *See Nugent v. Colvin*, 12–CV–661S, 2013 U.S. Dist. LEXIS 132871, at *12 (W.D.N.Y. Sept. 14, 2013) ("[B]ecause it appears from the record that the ALJ ignored the opinion of [a chiropractor], as opposed to determining it should be afforded little to no weight based on the evidence, remand is warranted."). As was the case with Dr. Beaupin's disability opinion, Dr. Guzinski's opinions were conclusory and perfunctory. On remand, the ALJ may find that Dr. Guzinski's opinions are entitled to little or no weight. It is not Court's role to make that determination in the first instance.

The Commissioner argues that it is her responsibility to "weigh medical opinion evidence and to resolve conflicts of that evidence" and that an ALJ is not required to track any one medical opinion or reconcile every piece of contradictory medical evidence. (Dkt. 7–1 at 24). The Commissioner is correct. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir.2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence."); *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir.2012) ("[A]n ALJ is not required to discuss every piece of evidence submitted.")[1]. However, this does not end the Court's inquiry. Although the Commissioner has primacy in weighing the evidence, the ALJ is required to follow the Social Security regulations in doing so. The ALJ did explicitly review and weigh the opinions of Drs. C. Huckell, Balderman, and Tetro, as required by the regulations. (*See* Tr. 19). The Court does not disturb the ALJ's analysis of those medical opinions. But ALJ Mazzarella's failure to follow Social Security regulations regarding the opinions of Drs. Beaupin and Guzinski is legal error. *See Burgess*, 537 F.3d at 129. Because this requires remand, the Court does not address Plaintiff's alternate argument regarding the ALJ's credibility analysis.

## V. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the plead-

---

1. Plaintiff asks the Court to ignore the *Brault* decision because—according to Plaintiff—the *Brault* holding is "anomalous" and "based on an erroneous citation." (Dkt. 8 at 4). The Court is not inclined to ignore binding Circuit precedent and declines to do so here.

ings (Dkt. 7) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 4) is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.